**SO ORDERED.**

**SIGNED this 15 day of January,2015.**

*Stephani W. Humrickhouse*
_____
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

**IN RE:**

**BATE LAND & TIMBER, LLC**                           **CASE NO. 13-04665-8-SWH**

**DEBTOR**                                                     **CHAPTER 11**

### ORDER

The matters before the court are confirmation of the debtor's chapter 11 plan of reorganization and the motion for relief from stay filed by Bate Land Company, LP ("BLC"). Numerous hearings took place in Raleigh and Wilmington, North Carolina, beginning on November 7, 2013, and concluding on May 28, 2014.  Summaries of evidence were filed by BLC on June 9, 2014, and by the debtor on June 16, 2014.  Legal briefs were filed on September 11, 2014, by both BLC and the debtor, although the court has since stricken BLC's brief to the extent provided by the Order Regarding Debtor's Motion to Strike, Doc. No. 296, entered on December 4, 2014.

As set forth more specifically below, this Order provides as follows: (1) the debtor has satisfied the requirements of § 1129(a); (2) the fair market value of the Broad Creek tract is $3,143,000 and the fair market value of the Bay River/Smith Creek tract is $5,700,000; (3) the allowed secured claim of BLC is between $14,931,823.06 and $15,411,284.12; (4) the court cannot determine whether the plan complies with § 1129(b) until the debtor identifies additional tracts to

surrender and/or opts to amortize the remaining amount of the secured claim of BLC; (5) the motion for relief from stay is denied, and (6) a hearing will be scheduled to determine the amount of BLC's secured claim.

## BACKGROUND

Bate Land & Timber, LLC (the "debtor") filed a petition for relief under chapter 11 of the Bankruptcy Code on July 26, 2013. The debtor is engaged in the business of real property investment and timber management. Prior to filing the petition, the debtor and BLC entered into an agreement in 2006 (the "Purchase Contract") pursuant to which the debtor purchased 79 tracts of real property from BLC, and BLC provided financing, secured by multiple deeds of trust on the subject properties.[1] At closing, the debtor paid BLC $9,000,000 in cash, and executed a promissory note in the amount of $56,000,000. Over several years, the debtor paid a substantial amount of the debt to BLC through, among other things, the sale of certain parcels of property pledged as collateral for the loan and the proceeds of timber sales. Each parcel sold was released from the applicable deed of trust upon the debtor's payment of corresponding release prices set out in the Purchase Contract. The amount of timber sales proceeds was calculated pursuant to a Modification and Settlement Agreement dated January 19, 2011, under which BLC received 50% of the timber sales proceeds from tracts identified in the Agreement as "development tracts."

At some point, however, the debtor and BLC experienced discord in their relationship. In an effort to sever its relationship with BLC, on July 26, 2013, the debtor recorded a special warranty deed in an attempt to convey back to BLC two tracts of property serving as its collateral, commonly

---

[1] The contract originally was executed by Southeastern Timberlands Company on April 14, 2006. The debtor was organized on July 31, 2006 and became a party to the contract by virtue of assignment.

2

known as the Broad Creek and Bay River/Smith Creek tracts. A few hours later, the debtor filed its bankruptcy petition. In the debtor's schedules filed on August 23, 2013, the largest debt listed is an unsecured, contingent, and disputed claim held by Bank of America in the amount of $74,000,000. BLC is scheduled as a secured creditor by virtue of a deed of trust on property valued at $47,687,250; however, the claim amount is listed as $0.00. Other secured creditors include Deere & Company, with a claim in the amount of $26,523, and Northen Blue, LLP ("Northen Blue"), with a claim in the amount of $11,778.27.

On August 30, 2013, the debtor filed its plan of reorganization. The proposed treatment of BLC, which later was amended, stated that as of July 25, 2013, the debtor had paid $60,334,242.05 in cash toward its debt to BLC, leaving a balance (including interest at the rate of 9%) of $12,936,254.65, and that by deeding the Broad Creek and Bay River/Smith Creek tracts to BLC just prior to the filing of the petition, the debtor fully satisfied its obligation to BLC. Further, on September 10, 2014, the debtor preemptively objected to any claim filed by BLC, asserting that by deeding the Broad Creek and Bay River/Smith Creek properties to BLC, the debt to BLC was fully satisfied in accordance with North Carolina law. BLC filed a proof of claim in the amount of $12,924,417.87 on September 27, 2013.

As to the Deere & Company claim, the plan states that the debtor executed a loan contract and security agreement for the purchase of a tractor on July 11, 2013. The contract calls for five annual payments of $6,382.95. Deere & Company had not filed a proof of claim at the time the plan was filed, however, the debtor scheduled the amount owed as of the petition date at $26,523.[2] The

---

[2]On September 6, 2013, Deere & Company filed a proof of claim in the amount of $26,565.51. The contract attached to the claim indicates the following: equipment purchase price, $39,000; down payment, $14,000; amount financed, $26,523; total of payments, including finance

plan calls for amortization of the debt to Deere & Company over a six-year period, with payments beginning one year after the plan's effective date.  With regard to the Northen Blue claim, the plan states that on July 18, 2013, the debtor executed a note in favor of the law firm in the amount of $14,142.83 for legal services rendered, secured by a deed of trust of the same date.  The petition balance of $11,778.27 is to be paid over the course of one year with interest at 4%, beginning one year after the plan's effective date.  Finally, as to the Bank of America claim, the plan states that the debtor was a joint obligor on a secured line of credit and promissory note, although none of the debtor's property was pledged as collateral, and that the parties had entered into a settlement agreement prior to the debtor's petition filing.  The plan provides that the $74,000,000 debt continues to exist but does not constitute a lien upon the debtor's assets, and that by virtue of the settlement agreement, the debtor is not presently obligated to make any payments to Bank of America.

The debtor filed an initial ballot report on November 7, 2013, which indicated that the following classes accepted the plan: Classes 1 and 2, the administrative and tax claimants; Class 6, Northen Blue; Class 8, comprised of general unsecured claimants; and Class 9, the equity security holders.[3]  Rejecting ballots were cast by BLC (Class 4) and Deere & Company (Class 5), and each of those creditors filed an objection to confirmation of the plan.  On December 4, 2013, the court entered an order denying the debtor's objection to BLC's claim, holding that the special warranty deed which purported to convey the Broad Creek and Bay River/Smith Creek tracts back to BLC

charge, $31,914.75; and annual percentage rate, 6.5%.

[3]Neither Class 3 (unimpaired tax claims) nor Class 7 (Bank of America) voted on the plan. Two ballots were cast in Class 8, by Big Beaver Land & Timber, LLC, representing a claim of $38,524.40, and Paramounte Engineering, Inc., representing a claim of $43,547.50, both of which accepted the plan.

failed for lack of acceptance.  In re Bate Land & Timber, LLC, Case No. 13-04665-8-SWH, 2013

WL 6284169 (Bankr. EDNC Dec. 4, 2013).  On December 5, 2013, Deere & Company withdrew

its objection to confirmation and the tractor claim was assigned to Revels Turf and Tractor, LLC.

      In light of the ruling on the objection to BLC's claim, the debtor filed an amendment to the

plan on December 23, 2013, followed by a "clarified" amendment on January 3, 2014 (the

"Amended Plan Treatment"), modifying the proposed treatment of BLC's claim.  The Amended Plan

Treatment provides as follows, in pertinent part:

> Based on the "Contract Price" established by the parties in the
> Purchase Contract, the Debtor asserts that deeding the Bay River-
> Smith Creek tract (approximately 408.6 acres in Pamlico County) and
> the Broad Creek tract (approximately 212 acres in Pamlico County)
> will give BLC the indubitable equivalent of its claim and will deed
> those properties to BLC.  Alternatively, should the Court determine
> that the Contract Price is not binding on BLC, then the Debtor will
> choose to either satisfy the claim through deeding properties, or
> through payments over time, or through a combination of deeding
> properties and payments over time.  In that event, the Court shall
> determine the values of the Bay River-Smith Creek tract and the
> Broad Creek tract, as well as each of the Proposed Properties.  After
> the Court determines the respective values, the Debtor will determine
> which, if any, of the Proposed Properties to deed to BLC, in addition
> to the Bay River-Smith Creek and the Broad Creek tracts, in
> satisfaction of its claim as the indubitable equivalent of its claim.

Amended (Clarified) Treatment to Class 4 of the Debtor's Plan of Reorganization, Doc. No. 139,

pg. 2.  Thus, in order to satisfy the requirements of § 1129(b), the debtor proposes to deed the Broad

Creek and Bay River/Smith Creek tracts to BLC in full satisfaction of BLC's claim pursuant to the

"Contract Prices," and in the alternative, proposes to either deed those properties plus additional

properties[4] or make payments over time, or a combination of both.  The Amended Plan Treatment

---

      [4]In its plan, the debtor lists 10 properties identified as the "Proposed Properties,"any of
which it may choose to surrender to BLC, should the debtor decide to deed properties in addition

further provides that if the debtor chooses to make payments over time or pay the claim through a combination of deeding properties and payments over time, any remaining balance shall be amortized over 20 years, and that BLC shall receive 70% of land sale proceeds and 50% of timber sale proceeds toward satisfaction of the debt. On February 26, 2014, the debtor filed an amended ballot summary indicating the receipt of an accepting ballot from Revels Turf and Tractor, such that the ballot cast by BLC constituted the only remaining rejecting ballot to the plan.[5]

BLC filed an amended proof of claim on May 28, 2014. Rather than asserting a single claim amount, BLC attached a document to the proof of claim form that essentially asserts a range of claim amounts, dependent upon certain potential future determinations of the court. Specifically, the attachment provides as follows:

| | |
|---|---|
| Petition Date Claim | $12,924,417.87 |
| Interest (Default Rate – 12%) Per Diem of $3,632.30 x 292 days | $1,060,631.60 |
| Total Principal and Interest | $13,985,049.47 |
| Petition Date Claim | $12,924,417.87 |
| Interest (Contract Rate – 9%) Per Diem of $2,724.23 x 292 days | $795,475.16 |
| Total Principal and Interest | $13,719,893.03 |
| Costs | |
| Attorney's Fees Appraisal Fees | $534,011.75 $35,000.00 |

---

to the Broad Creek and Bay River/Smith Creek tracts to BLC.

[5]Further, the amended ballot summary indicated an additional accepting vote in the general unsecured class (Class 8), cast by Forestree, Inc., representing a claim in the amount of $8,000.

Thus, BLC appears to view its claim amount as dependent upon whether or not post-petition fees and costs are allowed, which is in turn dependent upon whether BLC is fully secured or undersecured pursuant to § 506(b).  Additionally, there is an issue as to whether or not a contract or default rate of interest may be applied.[6]

BLC objects to confirmation of the debtor's plan based on the following primary contentions: (1) the plan fails to satisfy § 1129(a)(11) because it is not feasible; (2) the plan fails to satisfy § 1129(a)(3) because it was not filed in good faith; and (3) the plan is not fair and equitable as required by § 1129(b) either because the proposed property transfer does not give BLC the indubitable equivalent of its claim, or because the proposed amortization does not reflect market terms.

### DISCUSSION

### I.    Burden of Proof Under §§ 1129(a) and (b)

Before embarking upon an analysis of the specific requirements of § 1129's confirmation standards, it is important to determine the applicable burden of proof.  The Bankruptcy Code does not articulate a specific standard of proof related to the debtors' efforts to satisfy the provisions of § 1129.  "In the face of this silence, courts may not imply a higher standard than the preponderance standard normally applied in civil proceedings."  In re Combs, 838 F.2d 112, 116 (4th Cir. 1988). In Combs, the U.S. Court of Appeals for the Fourth Circuit considered the question of what standard of proof to require in the context of exceptions to discharge under § 523, with respect to which the

---

[6]As of January 5, 2015, the interest component of the claim was $1,917,854.50 (per diem of $3,632.30 x 528 days) when calculated at the default rate of interest for a total claim of $15,411,284.12, and $1,438,393.44 (per diem of $2,724.23 x 528 days) when calculated at the contract rate of interest for a total claim of $14,931,823.06.

Code does not specify a standard of proof.  In that situation, the court applied the "normal" preponderance standard, having found no basis upon which to "justify judicial imposition of a heavier burden of proof on creditors seeking to have a debt determined nondischargeable under § 523(a)(6)."  Id.; see also Whitson v. Middleton, 898 F.2d 950, 952 (4th Cir. 1990) (applying preponderance of the evidence standard to a different subsection of § 523 (specifically, § 523(a)(9)) on grounds that "there is no reason to distinguish the conclusion reached in [Combs]").  Later, in a § 727 proceeding where, again, the burden of proof was not specified, the Fourth Circuit held that it was "appropriate to reason by analogy," applied the preponderance standard, and reiterated that when the Bankruptcy Code is silent as to standard of proof, courts may not require proof beyond a preponderance of the evidence.  Farouki v. Emirates Bank Int'l., Ltd.,14 F.3d 244, 249-50 & n. 17 (4th Cir. 1994).

These Fourth Circuit cases align with the Supreme Court's decision in Grogan v. Garner, wherein the Court discussed the relationship between standards of proof and the factual contexts to which they apply.  498 U.S. 279, 286 (1991).  The Court held that where neither the statute (in Grogan, § 523) nor its legislative history prescribed a specific standard of proof, that silence is "inconsistent with the view that Congress intended to require a special, heightened burden of proof." Id.  Instead, "[b]ecause the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, *we presume that this standard is applicable in civil actions between private litigants*," unless the individual rights at stake are especially significant (including, for example, deportation or involuntary commitment to a mental institution).  Id. (emphasis added).  In so holding, the Court rejected the debtor's argument that establishing the fraud exception to dischargeability was subject to a higher level of proof than other exceptions to

dischargeability, such as claims for child support and alimony. Id. at 287. The Court also pointed to the structure of the statute, noting that "[b]ecause it seems clear that a preponderance of the evidence is sufficient to establish the nondischargeability of *some* of the types of claims covered by § 523(a), [including "certain fines and penalties, educational loans, and tax obligations"] it is fair to infer that Congress intended the ordinary preponderance standard to govern the applicability of *all* the discharge exceptions." Id. at 287-88 & n.14 (emphasis added).

The applicability of the preponderance of the evidence standard might seem to be something of a "given" in light of Grogan, but it is not, especially in the context of cramdown under § 1129(b). On this issue, the U.S. Court of Appeals for the Fifth Circuit has explained: "The first question that we need to resolve is the debtor's standard of proof in proving that the reorganization is confirmable under § 1129(a) *and whether the fact that this is a § 1129(b) cramdown affects the standard*." In the Matter of Briscoe Enters., Ltd., 994 F.2d 1160, 1163-64 (5th Cir. 1993) (emphasis added), cert. denied, 510 U.S. 992 (1993). The Briscoe court's examination was prompted by its observation that "[a] number of bankruptcy courts have used the clear and convincing standard in a cramdown, but in none of the cases have we found a satisfactory explanation why that is the appropriate standard." Id. at 1164. Noting that some courts elect to dodge the question[7] when the plan under consideration would fail under either a preponderance or a clear and convincing standard, the appellate court announced that in the case before it, hedging was not an option: The case was one "in which the plan

---

[7] For example, this court did not reach the question in Bannerman I because, after a thorough and multi-layered valuation assessment and after days of testimony, the court determined that the value of the property the debtor proposed to surrender in a partial dirt-for-debt case established a sufficient equity cushion over and above the amount of the creditor's secured claim to *satisfy* even the higher standard. In re Bannerman Holdings, LLC (Bannerman I), No. 10-010530-SWH, 2010 WL 4260003, at *4 (Bankr. E.D.N.C. Oct. 20, 2010), *reversed in part and vacated on other grounds*, Case No. 7:11-CV-00009-H (E.D.N.C. Sept. 30, 2011) (Bannerman II).

would not pass a clear and convincing standard, but, . . . it was not clearly erroneous for the bankruptcy court to conclude that the plan was feasible and the cramdown fair and equitable under a preponderance standard." Id. at 1165.

After a thorough review of decisions from other courts coming down on both sides of the matter, the Briscoe court concluded that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof under both § 1129(a) and in a cramdown." Id.; accord In re Ambanc La Mesa Ltd. P'ship, 115 F.3d 650 (9th Cir. 1997) (holding that preponderance of evidence standard applies to both §§ 1129(a) and (b)), cert. denied, 522 U.S. 1110 (1998); In re Paige, 685 F.3d 1160 (10th Cir. 2012) (same, citing Briscoe). This court is persuaded that the Briscoe court's rationale in determining that the preponderance of the evidence standard applies to all aspects of a bankruptcy court's consideration of whether to confirm a debtor's plan under § 1129 is both accurate and consistent with controlling Fourth Circuit and Supreme Court precedent.

Further, it is apparent that growing numbers of other courts have determined that "as Briscoe makes clear, Supreme Court precedent – including in the bankruptcy context – is clear that, when, as here, a dispute is essentially a monetary one that does not implicate individual liberty concerns, and when neither the language of the governing statutory provision nor its legislative history suggest that Congress intended the imposition of a higher burden of proof, then the party who has the burden need meet it by only a preponderance of the evidence." In re Trenton Ridge Investors, LLC, 461 B.R. 440, 461-62 (Bankr. S.D. Ohio 2011) (applying preponderance of the evidence standard in the context of both §§ 1129(a) and (b), adopting the Briscoe analysis, and noting the trend among other

courts to do same); see also, e.g., In re Paige, 685 F.3d 1160 (citing Briscoe); In re 20 Bayard Views, LLC, 445 B.R. 83 (Bankr. E.D.N.Y. 2011) (same); In re Cellular Info. Sys., Inc., 171 B.R. 926 (Bankr. S.D.N.Y. 1994) (discussing split of authority and finding Briscoe persuasive).

With this in mind, the court turns first to the debtor's efforts to satisfy the confirmation requirements of § 1129(a).

## II.    Feasibility and Good Faith Under § 1129(a)

Section 1129(a) sets out the requirements for confirmation of a chapter 11 plan, including the general rule under subsection (a)(8) that all impaired classes must accept the plan. The debtor concedes that it cannot satisfy § 1129(a)(8) and thus seeks to cram down the plan under § 1129(b). Section 1129(b)(1) provides that a debtor may confirm a plan if all the requirements of § 1129(a) except § 1129(a)(8) are satisfied, so long as the plan does not discriminate unfairly and is fair and equitable to the classes not accepting the plan. In re Bryson Props., XVIII, 961 F.2d 496, 500 (4th Cir. 1992).

Before proceeding to a cramdown analysis, therefore, the debtor must establish compliance with every requirement under § 1129(a) *other* than § 1129(a)(8). BLC has argued that the plan does not satisfy the feasibility requirement of § 1129(a)(11) because the debtor has not shown that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). BLC argues that if the debtor elects to amortize all or a portion of the debt, the debtor is not currently generating sufficient funds to make payments over time. The debtor, in turn, asserts that it is committed to "standing on its own," and that it will be able to do so once it is no longer bound by the Purchase

11

Contract's required payment of substantial release fees to BLC upon the sale of property and timber. Being free from such an onerous requirement, the debtor argues, will allow it to sell property and timber on its own terms, which will generate sufficient funds to operate and to make payments to BLC.[8]  The court finds that in light of the debtor's proposed satisfaction of BLC's claim potentially through the transfer of property alone, it may not be necessary to determine whether the debtor can make payments over time.  The court also finds it noteworthy that BLC has argued for *feasibility purposes* that the debtor cannot make the payments if the debt is amortized, while contemporaneously asserting for *purposes of its bad faith argument* that the debtor has sufficient resources to pay claims immediately such that impairment is not necessary.  Obviously, these positions are inconsistent.  However, in light of the potential full repayment of BLC's claim through "dirt" rather than cash, the court will determine the feasibility of a plan requiring payments over time only if the debtor proposes amortization of the debt upon receiving the court's valuation rulings below.  If the debtor chooses to pay BLC's claim solely through dirt for debt, § 1129(a)(11) clearly is satisfied.

The court's focus will now turn to whether the debtor has satisfied the good faith requirement of § 1129(a)(3).  Section 1129 provides that "[t]he court shall confirm a plan only if . . . [t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  Although the term "good faith" is not defined by the Code, courts have generally interpreted it to mean there is a "'reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" In re Madison Hotel Assocs., 749 F.2d 410, 425

---

[8]Additionally, the debtor testified that BLC had rejected requests for partial release fee satisfaction where the debtor had located a buyer for a portion of a particular tract.  According to the debtor, the ability to sell partial tracts is important to its business success going forward.

(7th Cir. 1984) (quoting In re Nite Lite Inns, 17 Bankr. 367, 370 (Bankr. S.D. Cal. 1982)).  In addition, the Fifth Circuit has held that "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe), 994 F.2d 1160, 1167 (5th Cir. 1993).  When conducting a good faith inquiry, a court must view the plan in light of the totality of the circumstances surrounding the proposal of the plan.  In re Piece Goods Shops Co., 188 B.R. 778, 790 (Bankr. M.D.N.C. 1995); see also Behrmann v. Nat'l Heritage Foundation, Inc., 663 F.3d 704 (4th Cir. 2011) (finding no clear error in bankruptcy court's finding that the debtor's plan was filed in good faith where the bankruptcy court "specifically examined the totality of the circumstances surrounding the formulation of the plan," and also examined negotiations with adverse parties, objections and responses thereto, and all other evidence presented).

Although BLC has asserted a multitude of reasons that it believes the plan was filed in bad faith, at the heart of the matter is BLC's contention that this is a two-party dispute, and that the debtor has created impaired accepting classes solely in order to achieve bankruptcy protection and thwart BLC's foreclosure attempts.  To that end, BLC argues that the present case is comparable to In re Swartville, Case No. 11-08676-8-SWH, 2012 WL 3564171 (Bankr. E.D.N.C. Aug. 17, 2012). In that case, the court denied confirmation of the debtor's chapter 11 plan upon finding that it failed to satisfy the good faith requirement of § 1129(a)(3).  In Swartville, however, with the exception of the objecting large institutional secured creditor, the debtor scheduled only four non-insider unsecured creditors with claims totaling $8,901.  Only one ballot was cast in that class, an acceptance from a creditor with a claim of $1,170, failing which, the debtor would not have been

able to request cram down of the secured creditor.  Additionally, the original principal amount of the loan was $1,615,000 and the secured creditor's claim totaled $1,624,530, suggesting that very few payments had been made prior to filing the bankruptcy petition.  Finally, and of great significance to the court, the plan provided for payment of the unsecured claims within 60 days of the plan's effective date by the guarantors; however, one of the guarantors testified that he could pay those claims immediately, and actually offered to do so during the hearing.  Thus, the evidence strongly supported a finding of artificial impairment and an improper utilization of the Bankruptcy Code, resulting in denial of confirmation.

Here, on the other hand, the debtor has paid more than $60,000,000 to BLC toward the original principal amount of $65,000,000.  Although the balance on the BLC debt of roughly $15,000,000 is significant, the debtor scheduled a much larger debt, albeit unsecured, to Bank of America in the amount of $74,000,000.  And even though a principal of the debtor, Mark Saunders, testified that settlement terms had been reached with Bank of America as of the petition date, he further testified that the settlement was not "complete," in that "hangover" provisions could permit clawback of funds by the bank if certain conditions of settlement were not met.  Mr. Saunders testified that he therefore sought unequivocal resolution of the Bank of America debt through the bankruptcy process.  Further, although BLC argues that the debtor has other sources from which it could fund its plan, such as loans from non-debtor entities, the debtor's plan, unlike the one proposed in the Swartville case, does not provide for payments from other sources.  Instead, this debtor seeks to stand on its own, and proposes to do so through self-managed sales of property and timber.

BLC next argues in support of its bad faith contention that the debtor attempted to create impaired accepting classes in order to achieve confirmation. For example, BLC asserts that the claim originally held by Deere & Company and later assigned to Revels Turf and Tractor was created through the purchase of a tractor that was previously leased by another entity managed by Mr. Saunders, Ocean Ridge, and was not necessary to the debtor's operations. Mr. Saunders testified, however, that the tractor was being used to mow the *debtor's* properties, and would continue to be used on the debtor's properties post-confirmation, especially to maintain the properties that would be listed for sale. Further, Mr. Saunders stated that rather than continuing to ride on Ocean Ridge's coattails, transferring the tractor into the debtor's name served the debtor's purpose of taking the necessary measures to stand on its own. Finally, Mr. Saunders testified that the pre-petition timing of the loan from Deere & Company was due to the fact that he felt it would be difficult to qualify for financing of equipment after going through bankruptcy. BLC further argues that the purchase of the Deere & Company claim by Revels Turf and Tractor is suspect and was motivated by an existing business relationship between Revels Turf and Tractor and Ocean Ridge. Mr. C. Turner Revels, Jr., of Revels Turf and Tractor, however, testified that he handled this transaction in the same way he has handled other claims bought out of bankruptcy cases, and that he did not have any side agreements with the debtor or Mr. Saunders. Based on the testimony as a whole, the court finds no improper purpose in the debtor's pre-petition purchase of the tractor. Instead, the soon-to-be debtor acted with a legitimate purpose: to ensure that the debt was listed on its books rather than on those of a non-filing entity in light of the debtor's use of the equipment to maintain its properties.

15

Although the existence of only one impaired accepting class is necessary to proceed to cram down, the court will also evaluate BLC's assertion that the debtor has artificially impaired the secured claim of Northen Blue. Mr. Saunders testified that the debt to Northen Blue arose from legal services initially provided in 2011, when the debtor and approximately 14 other entities managed by Mr. Saunders were faced with a lawsuit filed by Bank of America seeking $86,000,000 in damages. Northen Blue provided legal counsel to all of these entities, including the debtor, as all were sued on a joint and several liability theory of recovery. The debtor executed a note and deed of trust in favor of Northen Blue on July 18, 2013, which provided for payment of the debt in full over the course of six months, and made a payment of $2,384.71 on July 25, 2013, pursuant to the note. BLC argues that the securitization of this debt shortly after receiving bankruptcy advice from the debtor's current counsel and 8 days prior to filing the bankruptcy petition is an indicator that the claim was created in bad faith solely to produce an accepting class.[9] Mr. Saunders testified, however, that the debtor was unable to pay the debt in full, and therefore executed the promissory note and deed of trust.

BLC further points to the fact that none of the other related entities that engaged Northen Blue signed a note and security agreement, despite having assets available, as an indicia of bad faith. In this regard, Mr. Saunders testified that the services provided by Northen Blue were initially performed in part for the benefit of the debtor, and were performed exclusively for the debtor after April 2013, and that in turn, the debtor was obligated to pay for the services it received. The evidence simply does not suggest bad faith. The debtor had a debt it could not pay in full, so it

---

[9]The Statement of Financial Affairs, Doc. No. 37, pg. 21, provides that the debtor made a payment of $10,000 to Oliver Friesen Cheek, PLLC on July 2, 2013 for bankruptcy-related legal services.

promised to pay the debt over time and pledged property as security.  In light of the services the debtor received from Northen Blue and the debtor's stated desire to stand on its own, it is not surprising that the debtor executed the note and deed of trust in connection with its debt to Northen Blue.  The court concludes that the debtor has not exhibited bad faith in its treatment of the Northen Blue claim.[10]

Finally, BLC maintains that even if the court does not take issue with individual actions of the debtor such as the loan from Deere & Company and the securitization of the Northen Blue debt, the totality of the circumstances support a finding that the debtor did not propose the plan in good faith.  It is BLC's position that taken as a whole, the debtor's handling of the Deere & Company/Revels Turf and Tractor claim, the Northen Blue claim, the Bank of America claim, and the purportedly stale claims in the unsecured class suggests the debtor engaged in calculated maneuvers during the weeks prior to filing the petition aimed at achieving a tactical advantage over BLC.  Further, BLC asserts that the debtor had resources available to pay smaller claims pre-petition (such as the Deere & Company/Revels Turf and Tractor or Northen Blue claims) because the evidence suggested that members of the debtor or related entities made payments to various vendors or professionals on behalf of the debtor just prior to filing the petition.[11]

---

[10]BLC made additional artificial impairment arguments with regard to the unsecured class on the basis that many of the claims were stale, and therefore the debtor acted in bad faith by proposing to pay such claims through the plan.  As the court noted during the hearings, however, the appropriate avenue for disputing such claims on any basis, including statute of limitations, is the claims objection process, which will remain available to BLC post-confirmation.  To date, BLC has not filed objections to any claims filed in the debtor's case.

[11]During the hearings, BLC noted various deposits occurring close in time and in matching amounts to various payments to vendors and professionals.  Mr. Saunders could not recall the specific sources of the deposits.

17

However, focusing on the totality of the circumstances, the court notes as follows: the debtor has paid over $60,000,000 toward its initial debt of $65,000,000; the debtor has exhibited a desire to properly denominate its own creditors and provide a structure for their repayment; and the debtor has recognized its inability to work together amicably with BLC and has legitimately chosen to employ the bankruptcy process to effectuate reasonable repayment terms. Additionally, the court has not been presented with any case law requiring continued assistance from third parties, such as members of the debtor or other related entities, once an entity files a bankruptcy petition. Rather, it is entirely plausible that a third party might at some point determine it is not amenable to or is not capable of continuing to provide such assistance. Upon considering the totality of the circumstances surrounding the proposal of the debtor's plan, the court holds that the plan was proposed with the legitimate and honest purpose of reorganizing and has a reasonable hope of success. The debtor therefore proposed the plan in good faith as required by § 1129(a)(3).

Based on the foregoing, the court finds that all the provisions of § 1129(a) have been satisfied with the exception of §1129(a)(8), and will therefore proceed to a cramdown analysis as to BLC's claims pursuant to § 1129(b).

## III.    Cramdown and "Indubitable Equivalence" Under § 1129(b)(2)(A)(iii)

The court may confirm the plan notwithstanding BLC's objection if the plan does not discriminate unfairly and is fair and equitable to BLC. 11 U.S.C. § 1129(b). An objecting secured creditor's treatment may be deemed fair and equitable if the treatment satisfies one of the three criteria set forth under § 1129(b)(2)(A), which requires that with respect to secured claims such as BLC's, the plan must provide:

> (i)    (I)  that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II)  that the holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii)  for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii)  for the realization by such holders of the indubitable equivalent of such claims.

§ 1129(b)(2)(A).  In this case, the debtor proceeds under the third criteria (at least under one of its options outlined in the plan, and the option currently at issue), and must establish by a preponderance of the evidence that its treatment of BLC provides "for the realization by [BLC] of the indubitable equivalent of [its] claims."  § 1129(b)(2)(A)(iii).

In order to evaluate the adequacy of the debtor's treatment of BLC's claim, the court must first determine the amount of that claim.  As previously noted, the amount of BLC's claim is dependent on whether it is fully secured or undersecured.  In accordance with § 506(b), BLC will only be entitled to recover interest, fees and costs if it is determined that BLC is a fully secured creditor.  Additionally, if found to be fully secured and entitled to interest, BLC claims the right to recover a default rate of interest.  Using BLC's claim, as amended on May 28, 2014, as a starting point, the amount due on the petition date was $12,924,417.87.  The debtor offered no evidence at the hearings to challenge the amount of the petition date principal claim.[12]

---

[12]The debtor did renew its argument that BLC has a claim in the amount of $0 (*i.e.* zero dollars) because of BLC's pre-petition attempt to reconvey the Broad Creek and Bay River/Smith Creek tracts.  However, the court again declines to accept that argument and stands by the ruling and reasoning contained in the court's order of December 4, 2013, which denied the debtor's objection to BLC's claim.  Debtor additionally argues that even if the pre-petition transfers were not valid, the court should attribute the values indicated in the Purchase Contract as release prices to the tracts.

Using a January 5, 2015 date to compute interest, and assuming that BLC's claim is fully secured, the BLC claim, using a non-default rate of interest, is $14,931,823.06 ($12,924,417.87 in principal; $1,438,393.44 in interest; $534,011.75 in attorneys' fees; and $35,000 in appraisal fees), and using a default rate of interest is $15,411,284.12 ($12,924,417.87 in principal; $1,917,854.50 in interest; $534,011.75 in attorneys' fees; and $35,000 in appraisal fees). The possible range of BLC's claim is $12,924,417.87 to $15,411,284.12. The court recognizes that the upper end of this range may increase with the inclusion of additional attorneys' fees and interest accrued prior to confirmation. At this stage of the proceedings, in light of the court's rulings herein, and because the parties have not fully articulated any arguments regarding the propriety of a default rate of interest, a determination of the range of BLC's claim will suffice.[13]

With the specific facts of this case now on the table, the court turns its attention to questions of law. Over the past few years, for reasons that seemingly are cosmic in nature and to which the bankruptcy judges of this district are not privy, the Eastern District of North Carolina has provided a non-stop bounty crop of dirt-for-debt cases, each with its own fresh, unique twist. The court would be delighted to share these cases out amongst its judicial neighbors, if only it were possible to deposit them at other districts' doorways like a bumper harvest of sweet potatoes or tomatoes, accompanied by a cheery "Enjoy!" Sadly, case allocation just does not work that way, and the court

---

However, the court notes that valuation is determined as of the date of confirmation, not the petition date, or any other date, such as the date of the Purchase Contract. See In re Sailboat Props., LLC, Case No. 10-03718-8-SWH, 2011 WL 1299301, at *2 (Bankr. E.D.N.C. March 31, 2011); Matter of Atlanta S. Bus. Park, Ltd., 173 B.R. 444, 450 (Bankr. N.D. Ga. 1994) ("when valuation is for the purpose of plan confirmation, the value *must* be determined as of the date the plan is confirmed") (emphasis added). It would therefore be inappropriate to attribute a 2006 value to the tracts for confirmation purposes.

[13]Further proceedings in this case, however, will be dependent upon a determination of the default rate of interest issue and, as is set out below, the court will schedule a hearing on that matter.

ventures again into the dirt-for-debt arena.  The fact that the terrain is familiar does not make it any less complicated to navigate.

The "indubitable equivalent" evaluation is a particularly challenging component of dirt-for-debt cases in that the court must take guidance from multiple policies and procedures, and because precedent on this point conflicts.  The starting line, at least, is clear: A bankruptcy court tasked with the responsibility of determining whether a debtor's proffered surrender of collateral provides a creditor with the indubitable equivalent of its claim must take the amount of the creditor's secured claim as its starting point, then set it against the present value of the property to be surrendered, which value the court must determine based on a conservative approach to valuation and the circumstances of the case.  In re Bath Bridgewater S., LLC, Case No. 11-06817-8-SWH, 2012 WL 4325650, at *4 (Bankr. E.D.N.C. Sept. 20, 2012) (noting that the first step in the analysis is the setting of the claim).

This being a "partial dirt-for-debt" case, the focus of the inquiry is whether the *partial* surrender of the collateral securing BLC's original loan, as proposed by the debtor, is of sufficient value to provide to BLC the indubitable equivalent of its secured claim.  It generally is understood that when a secured creditor receives *all* of the property to which its lien attaches, the creditor has received the full value – the "indubitable equivalent" – of its monetary claim, because "common sense tells us that property is the indubitable equivalent of itself."  Matter of Sandy Ridge Dev. Corp., 881 F.2d 1346, 1350 (5th Cir. 1989).  When a debtor's plan calls for surrender of *a portion* of the property in full satisfaction of the debt, however, the assessment becomes more complicated.

An early dirt-for-debt forerunner in this district was In re Fazekas, Case No. 92-02262-8-JRL (Bankr. E.D.N.C. May 17, 1993), which is notable in that it articulated the then-fresh fact that partial

dirt-for-debt is a viable option in appropriate circumstances. As this court explained in an earlier partial dirt-for-debt case, Bannerman I:

> In Fazekas, the "central issue" before the court was whether the debtor's plan to convey to the creditor only three of the five properties securing the creditor's claim in the original amount of $530,616.40 provided "sufficient value to be the indubitable equivalent of [the creditor's] claim." Fazekas, slip op. at 6. The court had no difficulty in generally accepting collateral payment as an appropriate method of satisfying a secured creditor's claim and also approved of the concept of partial surrender in full satisfaction of a debt, noting that not only is there "nothing inherently improper about a collateral payment arrangement," it is, in fact, specifically contemplated by the Bankruptcy Code. Fazekas, slip op. at 6 (citing 11 U.S.C. § 1123(a)(5)(B), which provides that a plan shall "provide adequate means for the plan's implementation, such as . . . transfer of all or any part of the property of the estate to one or more entities"). In Fazekas, the court relied on a three-step valuation process. Fazekas, slip op. at 7. First, the court determined the present fair market value for each property. Next, the fair market value was reduced by 10% in recognition of the sales commission typically charged by real estate brokers in the district, which the creditor would likely incur upon sale of a property. Fazekas, slip op. at 7. Last, the court applied a discount rate to the net value of each property to "reflect costs associated with [the creditor's] loss of the use of its money during the time the properties remain unsold." Fazekas, slip op. at 8.

In re Bannerman Holdings, LLC (Bannerman I), Case No. 10-01053-SWH, 2010 WL 4260003, at *4 (Bankr. E.D.N.C. Oct. 20, 2010), *reversed in part and vacated*, Case No. 7:11-CV-00009-H (E.D.N.C. Sept. 30, 2011) (Bannerman II).

The most challenging aspect of the dirt-for-debt scenario typically is valuing the properties. See, e.g., In re Arnold & Baker Farms, 85 F.3d 1415, 1423 (9th Cir. 1996) (noting that whether the amount of collateral given is sufficient to provide the indubitable equivalent of the claim is, in the context of partial surrender of secured property, "entirely" dependent on court's valuation of the collateral). While a case in which a partial surrender of collateral satisfies that standard generally is one in which the property to be surrendered has an "excess value" of some percentage or amount – *i.e.*, an "equity cushion" – that is not always so. This court previously has cautioned that "an

22

equity to value ratio will not always satisfy the standard and, in fact, an equity to value ratio may not always even be the relevant inquiry."    Bannerman I, Case No. 10-01053-SWH, 2010 WL 4260003, at *8.  In this case, as in others before it, the parties offer appraisals that assign markedly different values to the real property.  Bankruptcy courts are quite accustomed to this scenario, and are equipped to undertake the credibility assessment and layered fact-finding necessitated by it.  As the court has said before:

> The extreme differential does not, however, preclude valuation. It is a fact that the properties have a fair market value.  It is also a fact that determining what that value is, can be difficult.  A third fact is this: The court has a duty to value property pursuant to § 506, that duty is not limited to those instances where valuation is easy or uncontested, and that duty encompasses those instances where the economy is uncertain and comparable sales are scarce.  The fact that two appraisers have arrived at vastly different values cannot relieve the court of its obligation.  Therefore the court will determine a fair market value number for the property offered for surrender in the debtor's plan in satisfaction of § 506.

Bath Bridgewater, Case No. 11-06817-8-SWH, 2012 WL 4325650, at *4.  However, that said, the court is well aware that widely differing appraisals can serve as a red flag, signifying uncertainty with respect to some component of valuation.  See Bannerman II, Case No. 7:11-CV-00009-H (E.D.N.C. Sept. 30, 2011) (slip op.) (concluding that "[t]he wide-ranging valuations presented to the bankruptcy court, even among [the creditor's] own appraisers, are indicative of the uncertainty in the value of this particular property," and therefore "weigh against a finding of indubitable equivalence"); In re SUD Props., Inc., Case No. 11-03833-8-RDD, 2011 WL 5909648, at *11 (Bankr. E.D.N.C. Aug. 23, 2011) (concluding that a "large disparity in professionally appraised values demonstrate[d] uncertainty in attempting to forecast the price at which the Property will sell," such that "[t]oo much variation in values and too much uncertainty in the market equals no indubitable equivalent").

23

These observations are sound, so long as they are not taken to extremes. Obviously, executing the court's duty to find the value of property, as required by § 506(a), would be undermined entirely if a debtor or creditor could sideline or even defeat that process simply by introducing multiple or outlier appraisals into evidence. What matters is not the mere existence of widely varying appraisals, but rather the *reasons* for those variations. For example, the parties may disagree on the highest and best use of the property, such that the appraisals reflect their apples-to-oranges view of the scenario, as in the instant case. Or, wide variances can be the byproduct of different appraisers' methodologies, or appraisers' differing choices in how to categorize certain parcels of real property.[14]

And, of course, the variations might come down to appraisers' genuine uncertainty about market conditions. These considerations and more, including the credibility of the witnesses, are among those weighed by the court as part of the fact-finding process, and all are significant in the context of valuation under § 506 and, separately, in any subsequent determination of whether the value found by the court is sufficient under § 1129(b)(2(A)(iii) to provide a creditor with the indubitable equivalent of its claim. "When two appraisal reports conflict, a court 'must determine the value based on the credibility of the appraisers, the logic of their analyses and the persuasiveness

---

[14]In the court's experience, even valuation determinations that would appear so straightforward as to require uniform conclusions from all involved – such as whether a property is or is not "waterfront," and whether said water is or is not "navigable" – may result in wildly different conclusions, which in turn lead to wildly different appraisal values. Bath Bridgewater, Case No. 11-06817-8-SWH, 2012 WL 4325650, at *4-6 (out of twenty lots, creditor's appraiser designated six as "waterfront," while debtor's appraiser designated nineteen, thus giving rise to the "most hotly disputed issue during the confirmation hearing"). Discrepancies of this nature, and the "wide variations" born of them, are typically susceptible to resolution through the court's fact-finding process, and therefore should not, in and of themselves, preclude an indubitable equivalence determination.

of their subjective reasoning.'" <u>In re Sailboat Props., LLC</u>, Case No. 10-03718-8-SWH, 2011 WL 1299301, at *6 (Bankr. E.D.N.C. March 31, 2011) (quoting <u>In re Atlanta S. Bus. Park, Ltd.</u>, 173 B.R. 444, 450 (Bankr. N.D. Ga. 1994)) (internal citations omitted). It should go without saying that when more than two appraisal reports conflict, the responsibility of the court under § 506, and the process by which that responsibility is discharged, remains the same.

Competing appraisals aside, there are inherent uncertainties in any valuation undertaking. In awareness of this, courts take a conservative approach to the process, the objective being to derive from it the conservative fair market value of the property. "Subsection 506(a)(1) of the Bankruptcy Code directs the court to determine the fair market value of property in evaluating the secured status of a creditor." <u>In re 4.98 Westgate Partners, LLC</u>, Case No. 11-05768-8-JRL, 2012 WL 5879119, at *2 (Bankr. E.D.N.C. Nov. 21, 2012); <u>see also, e.g.</u> <u>3G Props.</u>, Case No. 10-04763-8-JRL, 2011 WL 5902504, at *6 (Bankr. E.D.N.C. July 12, 2011); <u>In re Clarendon Holdings, LLC</u>, Case No. 11-02479-8-SWH, 2011 WL 5909512, at *3 (Bankr. E.D.N.C. Oct. 19, 2011) (citing cases and assigning conservative fair market value to the debtor's surrender of all real property subject to lien), <em>vacated</em>, 2013 WL 8635348 (E.D.N.C. 2013) (remanding where record on appeal was unclear as to whether bankruptcy court considered depressed market conditions and the creditor's loss of income pending sale, and holding that creditor surrendering real property was not entitled to "full fair market value") (<u>Clarendon II</u>).[15] Where the debtor retains the property being valued, "that value is what the

_____

[15]In <u>Clarendon I</u>, the issue before this court was whether, on a motion for valuation of collateral under § 506(a), the court should value the real property a debtor proposed to surrender under § 1129(b)(2)(A)(iii) pursuant to a fair market value standard, or a liquidation value standard. In accordance with all of its previous decisions and the weight of prevailing authority, the court assessed the fair market value, using a conservative approach to valuation. On appeal, although the district court noted that the question of which standard to use was the "sole issue" before it, the court vacated and remanded for rehearing on grounds that it was "unclear from the record on appeal

debtor has to pay," but "[i]f it chooses to surrender the property, that value is also *the value at which it would start the write down process to give the creditor the indubitable equivalent under 1129(b)(2)(A)(iii)*." 4.98 Westgate Partners, Case No. 11-05768-8-JRL, 2012 WL 5879119, at *2 (emphasis added).  By "write down," the 4.98 Westgate Partners court refers to the calculation of discounts for a creditor's sale costs and loss of money, undertaken as part of an indubitable

---

whether the bankruptcy court below considered [certain] factors in determining the value of the collateral to be surrendered by Clarendon."   Clarendon II, Case No. 7:11-CV-247-H, 2013 WL 8635348, at *2 (E.D.N.C. 2013).  Those factors were:

> Where a plan shifts to the creditor the burden to sell, and hence the risk of loss or potential for gain, the court must take these matters into consideration in valuing the property.  If, for example, a depressed market makes the potential for loss greater than the potential for gain, valuation must be approached conservatively. Additionally, the valuation of property surrendered to a creditor should take into account the loss of income a creditor may encounter prior to the sale or liquidation of the property.

Id.  The court agrees that these factors, which are incorporated as a matter of course into appraisals employing the "discounted cash flow" analyses, are of key importance.  They also are components of the Fazekas analysis, which *begins* with a determination of fair market value before incorporating any necessary discounts.  They are *not*, however, components of a liquidation analysis.  This renders the precedential import of the district court's opinion somewhat difficult to discern.

For purposes of precedential clarity, the court emphasizes that it does not read Clarendon II to call for application of a liquidation analysis in dirt-for-debt cases, nor does that decision reject use of the fair market value standard.   Instead, Clarendon II appears to vacate Clarendon I on more practical grounds, *i.e.*, to require of the bankruptcy court a more overt consideration and discussion of the factors cited above.  The single case discussed by the district court, Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 962 (1997), does examine the propriety of either a liquidation value or a *replacement* value standard, but Rash does so in the very different context of a debtor's retention of a motor vehicle over the creditor's objection through cram down under § 1325(a)(5)(B), and thus is not of probative weight in chapter 11 dirt-for-debt cases.  Rash, 520 U.S. at 960 ("In such a 'cram down' case, we hold, the value of the property (and thus the value of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business or situation would pay to obtain like property from a willing seller.").  See David Jennis, Standards of Value in "Dirt-for-Debt" Chapter 11s–Don't Make A Rash Decision, 31 Am. Bankr. I.J. 48 (April 2012) (discussing Clarendon I, among other cases).

26

equivalence analysis *after* first determining fair market value, as captured in the <u>Fazekas</u> analysis. <u>Id.</u> at *2.  In practical terms, this means that courts must consider each appraisal, as well as the testimony in support of or in contradiction to it.  Undergirding all aspects of this process is the court's intentionally conservative approach to valuation.

Another component of the court's analysis in this particular case, and a significant one, is the  determination of the property's "highest and best use."  The court previously has noted "the importance of case-by-case analyses when valuing property because of the various ways in which property can be disposed of or used, and the difficulty in determining the price such property would generate at a hypothetical sale, as well as the inherent vagaries in the valuation process."  <u>In re Sailboat Props., LLC</u>, No. 10-03718-8-SWH, 2011 WL 1299301, at *2.  In <u>Sailboat</u>, this court considered the subject property's "highest and best use" in the context of a § 506 valuation.  <u>Id.</u> (citing <u>In re Peerman</u>, 109 B.R. 718 (Bankr. W.D. Tx. 1989)).  The court reasoned that "[a]lthough some courts have determined value based on what the property is worth in the hands of a particular holder (*i.e.*, the secured creditor), this court will adopt the four-step 'highest and best use' inquiry employed by the <u>Peerman</u> court."  <u>Id.</u>

We now come back to the starting point: The first step in an indubitable equivalence evaluation is valuing the collateral.[16]  Turning to the specifics of this case, the debtor's plan provides that two tracts, the Broad Creek tract and the Bay River/Smith Creek tract, give BLC the indubitable equivalent of its claim if the Contract Prices established by the parties in the Purchase Contract are

---

[16]Because, as is set out more fully below, the court has determined that the value of the two tracts first offered for surrender by the debtor does not even equal the lowest possible amount of BLC's secured claim, the indubitable equivalence analysis cannot be completed without further action by the debtor pursuant to its plan, *i.e.*, selection of additional property or amortization of the balance of the claim, or a combination of both.

27

used. The plan further provides that if the court finds that the Contract Prices are not binding, the court is to determine the value of the Broad Creek and Bay River/Smith Creek tracts, as well as the value of each of the Proposed Properties.[17] If the court determines that the surrender of the Broad Creek and Bay River/Smith Creek tracts do not give BLC the indubitable equivalent of its secured claim, thereafter, the debtor will determine which properties, in addition to Broad Creek and Bay River/Smith Creek, to deed to BLC in satisfaction of its claim. The court has already determined that the Contract Prices are not binding on the parties.[18] Therefore, the court will analyze the Broad Creek and Bay River/Smith Creek tracts to determine their respective values.

The two tracts in question were appraised by Karen Cross for the debtor and Chuck Moody for BLC. Ms. Cross is a North Carolina State Certified General Real Estate Appraiser and a Licensed Real Estate Broker. She holds a bachelor of science in marketing from the University of North Carolina at Wilmington Cameron School of Business, as well as degrees from appraisal schools. Mr. Moody also is a State Certified General Real Estate Appraiser and a Licensed Real Estate Broker in North Carolina, South Carolina and Virginia, as well as a Registered Forester in North Carolina. Mr. Moody holds a bachelor of science in forest management from Virginia Polytechnic Institute and State University.

Ms. Cross determined that the highest and best use of the tracts is future residential development. She valued the Broad Creek tract at $3,800,000, and the Bay River/Smith Creek tract at $6,800,000. Ms. Cross's appraisals are effective as of December 23, 2013. Mr. Moody

---

[17]The Proposed Properties are the properties the debtor will choose from to deed to BLC in satisfaction of its claim pursuant to its plan.

[18]See Order dated December 4, 2013, 2013 WL 6284169; sources cited *supra* note 10.

28

determined that the highest and best use of the tracts is continued management for commercial forest products followed by future residential development. He valued the Broad Creek tract at $745,000, and the Bay River/Smith Creek tract at $800,000. Mr. Moody's appraisal of the Broad Creek tract is effective as of January 20, 2014, and his appraisal of the Bay River/Smith Creek tract is effective as of November 4, 2013. Both Ms. Cross and Mr. Moody offered testimony in support of their respective valuations, both appraisers utilized the sales comparison approach recognized by the Uniform Standards for Professional Appraisal Practice ("USPAP") in their appraisals.

At first blush, the vast valuation discrepancies between the appraisals might cause concern. However, the huge variances are easily explained: The appraisers arrived at different highest and best uses for the tracts. Mr. Moody's conclusion that the immediate highest and best use is management of the tracts for timber production necessarily results in a vastly lower valuation than that which results from Ms. Cross' determination that the highest and best use is future residential development. The discrepancies in value are mitigated further by Mr. Moody's opinion that "residential use would represent the ideal improvement for the proper[ties]," with timber management and recreation as an *interim* use. The highest and best use determination is therefore a threshold one for the court.

There are three standard criteria for determining the highest and best use of property for valuation purposes: physical possibility, legal permissibility and financial feasibility.[19] Both appraisers note that Pamlico County has no Unified Development Ordinance and therefore no zoning restrictions, although any use would have to comply with the Coastal Area Management Act

---

[19]The appraisers discuss a fourth criteria, Maximum Productivity. Because the court finds this criteria to be dealt with wholly through the others, especially financial feasibility, it is not discussed as a separate criteria.

("CAMA") and county regulations.  Both conclude that most uses would be legally permissible. With regard to physical possibility, there is some controversy.  In essence, although they agree on the types of soil found on the tracts and the percentage of wetlands, as well as access to water, telephone and electric utilities, Mr. Moody questions the suitability of the soil to support the construction of septic systems.  However, Ms. Cross's evidence showed that tracts in the area containing similar soil compositions have been used for residential construction.  It is also noteworthy that in Mr. Moody's 2005 appraisal, he specifically stated that these same tracts had soils suitable for development, and despite the fact that there was no evidence that the soil composition would change over time, he had no problem stating that the highest and best future use of the land would be residential development.  Moody Appraisals, Exs. 43 & 44.  It goes without question that ultimately, both appraisers believe that residential development is a physically possible use for both tracts.

Where the main disagreement lies is whether residential development is financially feasible. Before wading into the bases for that disagreement, it is worthwhile to note once again that both appraisers agree that ultimately, the highest and best use of the properties is residential development. Their disagreement is based simply on timing.  Mr. Moody opines that *at present*, it is financially infeasible for the tracts to be developed as residential subdivisions because:  (1) there is an excess inventory of residential lots that have been on the market for increasing periods of time; (2) new construction would only add to the excess inventory and depress pricing; and (3) lot sales are still stagnant or even decreasing.  However, Mr. Moody testified that Craven County, which neighbors Pamlico, is doing "ok" and generally has a fairly stable real estate market, as evidenced by

30

subdivision development.  These new developments in Craven County are in the same neighborhood as the subject tracts.

In contrast, Ms. Cross's evidence showed that:  (1) all indications are that the economy is returning from the deep recession of 2008; (2) although the market has slumped since the boom years preceding 2008, home sales have begun to rebound; (3) primary growth in the area involves residential waterfront development; (4) the scarcity of comparable land should make development desirable; (5) a primary influx of new residents comes from retirees and second homeowners seeking waterfront and water-accessible properties at more affordable prices than other booming waterfront markets; (6) the Pamlico Sound area has received publicity for its superior boating access points and marinas and is known for its hunting and fishing; (7) the Broad Creek provides access to the Neuse River, which is part of the Intracoastal Waterway, and the Bay River provides access to the cut-through of the Intracoastal Waterway/Goose Creek Canal to the Pamlico River; (8) the county is expected to face a 10% to 25% population increase between 2000 and 2030; and (9) the tracts are also nearby to several commercial districts, as New Bern is only a short drive away and portions of Bayboro and Oriental are within the tracts' neighborhood.

Further, and most importantly, both appraisers actually agree as to many indicators unique to the tracts: (1) waterfront lots are highly sought after and were in especially high demand prior to 2008; (2) the water frontage on the tracts is very navigable and lacks vertical hindrances such as bridges; (3) the two tracts have substantial water frontage that could yield a great number of waterfront lots; and (4) neither tract has any remaining merchantable timber because the timber was cut back to allow for residential development.  While it would take at least twenty to thirty years to

grow a merchantable timber crop on the tracts, the current timber coverage provides a desirable residential amenity component.

Based upon the foregoing, the court finds the highest and best use of the Broad Creek tract and the Bay River/Smith Creek tract to be residential development. The market in Pamlico County appears to be recovering, albeit slowly. Waterfront tracts are highly sought after and generally scarce. The population in Pamlico County is anticipated to grow, home sales are rebounding, and the tracts' locations are ideal given the general interest in boating and water-related activities in the area. Not only are the tracts graced with a substantial amount of water frontage, they are located on water with navigable depths and lacking vertical hindrances. This is a major attraction to boaters, and is especially relevant given Pamlico County's self-proclaimed title as the "sailing capital of North Carolina." Even Mr. Moody found that the highest and best use of the tracts would be residential development once the market improved, and that improvement has begun.[20] Although installing septic systems would be costly, it does not appear to be cost-prohibitive. Despite the absence of sewer services, the tracts do have access to municipal water, electricity and telephone services. Mr. Moody maintains that there are no economic or demographic trends that would indicate a substantial change in land use in the subjects' neighborhood within the next five to seven years, but in light of the twenty to thirty years it would take to harvest an economically viable timber crop, it cannot be said that the present highest and best use is timber management. Furthermore, Mr. Moody's determination that the *current highest* and best use of the tracts is commercial timber while

---

[20]The court acknowledges Mr. Moody's concerns as to his view of lot inventory, but interprets them not as impediments to a finding that residential development is the highest and best use of the tracts, but as a needed adjustment to valuation.

simultaneously stating that there *is no remaining economically viable timber crop on* either of the tracts is puzzling.

Now that the highest and best use of the tracts has been determined, the court will continue with its valuation of the specific tracts offered for surrender by the debtor in its plan. Since both appraisers employed a sales comparison method of valuation, the next step would ordinarily be to review the specific comparables selected by each of them. However, in this case, some general observations are in order. First, Mr. Moody opined that the highest and best use of the tracts is timber management, but none of the four comparables he selected for his appraisal of the Broad Creek tract list timber management as the highest and best use. Instead, they all list residential development as the highest and best use. These same residential tracts are included as comparables in his Bay River/Smith Creek appraisal, but with four additional timber tract sales. Mr. Moody stated during his testimony that it is important to use comparables that have the same highest and best use, yet he appears to have violated this very principle. Thus, Mr. Moody sidestepped a professed necessary first step for any appraisal. The court is at a loss as to what effect that divergence from ordinary procedure has on valuation. Secondly, while the text of Mr. Moody's comparables analysis speaks to adjustments made, he does not "show his work" by accounting for the conditions and revealing his reasoning and math. That is to say, the court is left with no understanding of the extent of the adjustments made. Additionally, it appears that he gave little weight to the fact that the tracts are waterfront and the water is navigable. Finally, the court notes that Mr. Moody has been engaged by BLC on timber-related projects for 11 years. This relationship may be a basis for a finding of bias in favor of the position of BLC and certainly provides the court with some insight into Mr. Moody's view of the world through "timber-colored glasses."

On the other hand, Ms. Cross used comparables that had the same highest and best use as the subject tracts. Further, in Ms. Cross's analysis of comparable properties, she made adjustments for factors such as market conditions, location, access, water frontage, water depth and zoning to come up with her valuations. Ms. Cross's appraisals showed her math in detail, providing the court with an explanation as to why she made adjustments to the comparable sale prices, and how those adjustments were made.

It is with this background that the court assesses the comparables chosen by the respective appraisers. First, the court will discuss the Broad Creek tract. The Broad Creek tract is a fee simple estate comprised of 212 gross acres of vacant land in Pamlico County. There are 189.8 acres of uplands and 22.2 acres of wetlands. The proportion of wetlands to the rest of the property is roughly 10%. The tract is surrounded by water on three boundaries: Broad Creek to the south, Burton Creek to the east and Pasture Creek to the west. The tract's water frontage amounts to 15,229.8 feet, or 2.88 miles, which is approximately 74% of its total perimeter. The water is of navigable depths and Broad Creek is without vertical hindrances. Additionally, three marina facilities are in close proximity to the subject. The subject has access to municipal water, electricity and telephone service. Although municipal sewer service is available in certain areas of the county and officials have indicated that capacity is available, the county has limited funding. Therefore, the future developer would likely need to expend funds to obtain this service or to install on-site septic systems. There are no zoning restrictions on the subject. The subject is accessible through existing roads that provide access to major throughways, and is within a short drive of schools, shopping and recreational facilities.

34

Mr. Moody identified and examined four comparable sales in his valuation of the Broad Creek tract. The court makes the following observations regarding those comparables. As noted before, all four comparables indicate highest and best uses as residential development. The sale dates range from May 2010 to January 2014. Three of the tracts are in Pamlico County and one is in Perquimans County. With regard to Comp #9, the court notes that the conveyance was accomplished through two deeds: one for 419 acres of vacant land and one for 91 residential lots. The total sales price was $1,700,000, and the appraiser accepted the buyer's allocation of $700,000 of that price toward the vacant land. Mr. Moody does note, however, that "the real estate revenue tax paid for the individual deeds conveying the property is not consistent with the [buyer's] allocation." The seller in Comp #9 was a financial institution that had gained title to the tracts through a foreclosure sale. It does not appear (because the appraisal does not indicate the extent or definitive identity of any adjustment) that any adjustment was made for the forced nature of the sale, water frontage, water depth or navigability, or the fact that the acreage was twice as large as the Broad Creek tract. Mr. Moody determined that the price per acre of this sale was $1,683 and he acknowledges that this forms the lower end of the range of the four comparables.

With regard to Mr. Moody's Comp #10, the court notes that the sale was made by public auction in accordance with a confirmed bankruptcy plan that was pending in this district. It does not appear that any adjustments were made for differentials in acreage, water frontage, or the forced nature of the sale. Mr. Moody determined that the price per acre of this sale was $5,625. Comp #26 involved a sale of 26 acres fronting on Broad Creek. The comparable had access to electricity, telephone and county water and had already been approved for the installation of a septic system. Mr. Moody states that he took the parcel's smaller acreage into account when he arrived at his

35

valuation conclusion, but does not indicate the extent of that adjustment. Mr. Moody determined that the price per acre of this sale was $7,103. Mr. Moody's final comparable, Comp #29, was a 93.2 acre parcel fronting on Chadwick Creek. Forty-one percent of the tract was wetlands and it did not have access to county water. Mr. Moody determined that the per acre value of this sale was $2,403.

Ms. Cross examined five comparable sales in Pamlico, Currituck and Craven counties. The comparables all had highest and best uses of residential development and involved sales taking place in 2008, 2009, 2010 and 2011, as well as a listing from 2013. Ms. Cross found that two of the comparables were most similar to the subject. The first, Comp #1, was a 2013 listing of 173.45 usable acres (216.81 gross acres) in Pamlico County for $23,522 per usable acre ($18,818 per gross acre). The comparable had 13,455 feet of water frontage and good water depth, and was close in proximity to the subject. Ms. Cross negatively adjusted the price by 10% to account for its status as a mere listing, and positively adjusted the price by 5% to account for the comparable's inferior access as compared to the subject. With her adjustments, Ms. Cross valued this comparable at $22,229 per acre.

The other most similar comparable, according to Ms. Cross, Comp #2, was a 2011 sale of 214.04 usable acres (242.04 gross acres) in Currituck County for $14,716 per usable acre ($13,014 per gross acre). This comparable had 2,849 feet of water frontage, with shallow depths along the shore that dropped to deeper depths in the river. Ms. Cross negatively adjusted the price by 5% to account for the comparable's superior zoning, and positively adjusted it by 10% for its inferior, more distant location and by 10% for its inferior water frontage/view. The comparable had better zoning than the subject, which has no zoning, because it was in a residential district with a small

36

commercial component.  With her adjustments, Ms. Cross valued the second comparable at $16,924 per acre.

Ms. Cross used three other comparables in her appraisal of the Broad Creek tract.  Two of the comparables involved bargain sales to the North Carolina Coastal Land Trust for use as a conservation easement.  Both of these comparables were in Craven County: Comp #3 involved a 2010 sale of 121.59 usable acres (135.09 gross acres) that sold for $17,189 per usable acre ($15,471 per gross acre), and Comp #4 involved a 2009 sale of 162.65 acres that sold for $18,014 per acre. Both of these comparables had frontage on Anderson Creek and had very narrow and shallow water depths of only about one to three feet.  Ms. Cross adjusted both comparables negatively by 5% to account for their superior locations, and adjusted them positively by 15% to account for their inferior water frontages/views and by 15% for their inferior water depths and accessibility.  Additionally, Ms. Cross negatively adjusted Comp #4 by 22% to account for the difference in market conditions. With her adjustments, Ms. Cross valued these comparables at $21,486 and $17,635 per acre, respectively.  These comparables were sold at a discount to a conservation land trust, but the price was adjusted to reflect the value reported to the IRS.  Ms. Cross stated that although bargain sales usually are not used in appraisals, they were used here due to the lack of recent sales of comparable large vacant land tracts.   Ms. Cross explained that preventing development was the basis for the conservation land trust's interest in the property.  The last comparable Ms. Cross used in her Broad Creek valuation, Comp #5, was a 2008 sale in Craven County comprising 240 usable acres (422.909 gross acres) at $10,415 per usable acre ($5,910 per gross acre).  Although this comparable had extensive frontage on Swift Creek, the width of the creek was small and the banks were overgrown. The comparable did not have an open water view, and the water depth was only one to three feet.

37

Ms. Cross made a positive adjustment of 5% for this comparable's inferior location in the interior of the county, a positive 15% adjustment for inferior water frontage/view, and a positive 15% adjustment for inferior water depths and accessibility. Ms. Cross also made a negative 28% adjustment to account for market conditions. With her adjustments, Ms. Cross valued Comp #5 at $10,075.

Having the benefit of both appraisals, the court must discharge its duty under § 506(a) to derive a value for the Broad Creek tract. Considering the methodology employed, context of the sales, highest and best use considerations, perceived bias and quality of comparables, the court finds the appraisal prepared by Ms. Cross to be most persuasive. Her selection of comparables was sound and her adjustments credible and ascertainable. As adjusted, the range of values of her comparables is $10,075 to $22,229 per acre. Based upon those comparables, she ultimately determines a value of $20,000 per usable/upland acre and $500 per wetland acre for the Broad Creek tract. While the court believes this value was competently derived, additional adjustments are warranted to ensure a conservative valuation. Thus, the court further discounts the value to account for the fact that, as of the time of Ms. Cross's testimony, her listing comparable, Comp #1, was still on the market, and had been for quite some time. This is so notwithstanding the fact that the court has considered Ms. Cross' testimony that the use of listings in appraisals is not uncommon, that some lenders require the use of listings in appraisals, and that listings can indicate what market participants expect for that type of property. The court further discounts Ms. Cross's values to account for the limited county funds to add sewer services for the benefit of the tracts, and the likelihood that a purchaser or developer will have to bear that cost. Finally, the court applies a discount to account for the abundance of unsold lots on the market that not only will be in competition with the subject, but that

38

reflect the current market state.  In applying this last discount, the court considered the anticipated population increase, further stabilization of the market and the desirable location of the tract.  The court calculates the present value of the Broad Creek tract at $16,500 per usable/upland acre and $500 per wetland acre for a total of $3,143,000.

The court will next discuss the Bay River/Smith Creek tract.  This tract is a fee simple estate comprised of three parcels of land totaling 408.10 gross acres: J04-11, 317.3 acres; J031-81, 83.6 acres; and J031-82, 7.2 acres.  The tract is made up of approximately 28.10 gross acres, or 7%, of wetlands.  The tract is surrounded by water on three boundaries: the Bay River to the east, Newton Gut to the south, which flows into Bay River, and Smith Creek and Tunnel Gut, which flow into the Bay River as well.  The total amount of water frontage equates to approximately 17,940.8 feet, or 3.40 miles, and makes up more than 50% of the tract's total perimeter.  The tract's water frontage is navigable and unrestricted by vertical challenges.  The J04-11 tract has the largest amount of water frontage.  The J031-81 tract has less water frontage, but has direct frontage on state highways. The J031-82 tract does not have water frontage and is bifurcated from the two larger parcels by a road.  The Bay River/Smith Creek tract is located in Pamlico County, has access to all municipal utilities and has good road frontage.  The tract is located on two-laned, paved highways that are state maintained.  Like the Broad Creek tract, officials have indicated that although municipal sewer capacity is available, the county has limited funding.  Therefore, the future developer would likely need to expend funds to obtain this service or install on-site septic systems.  There are no zoning restrictions on the subject.

Mr. Moody examined the same four comparables used in his Broad Creek appraisal, plus an additional four tracts with highest and best uses as timber tracts, in his valuation of the Bay

River/Smith Creek tract. Notably, Mr. Moody did not use different comparables or complete separate valuations of the three tracts encompassed within the Bay River/Smith Creek tract. Nor did his appraisal discuss the differences between the three tracts within the subject. Mr. Moody employed a collection of comparables varying greatly in size, from 26.05 acres to 586.7 acres. However, none of his comparables aligned in acreage with the subject tracts. Further, he apparently did not make additional adjustments to the Broad Creek comparables, because he reached the same valuation conclusion.

Ms. Cross used different comparables, all having residential development as the highest and best use, for each of the three tracts within the subject. For J04-11, the 317.3 acre tract, Ms. Cross used the same five comparables as she did for Broad Creek, given their larger size and extensive water frontage. The same adjustments were used in large part, with some minor additional adjustments. For Comp #1, Ms. Cross applied an additional negative 5% to account for the comparable's smaller size. Ms. Cross reached an adjusted value of $21,170 for this comparable. For Comp #2, Ms. Cross applied an additional negative 5% adjustment to account for the comparable's smaller size, and applied a positive 5% adjustment for the comparable's inferior utilities. Ms. Cross reached an adjusted price of $16,924 for this comparable. For Comp #3, Ms. Cross applied an additional negative 10% adjustment to account for the comparable's smaller size, as well as a positive 5% adjustment for its inferior utilities. Her adjusted value for this property was $20,627. For Comp #4, Ms. Cross applied an additional negative 5% adjustment for its smaller size, along with a positive 5% adjustment for its inferior utilities. Her adjusted value was $17,635. For Comps #3 and #4, the court added in a negative adjustment for the comparables' status as bargain sales. For Comp #5, Ms. Cross applied an additional negative 5% for its smaller size, as well as a

positive 5% for its inferior utilities.  Her adjusted value for this comparable was $10,075.  Based on these comparables, Ms. Cross reached a value of $18,000 per usable/upland acre and $500 per wetland acre for J04-11.  Ms. Cross's ultimate valuation for J04-11 was $5,305,400.

Ms. Cross used five comparables in her valuation of J-031-81, the 83.6 acre tract.  Comp #6 was a listing (listed in December 2013) for 33.62 usable acres (37.36 gross acres) in Pamlico County for $17,847 per usable acre ($16,060 per gross acre).  Ms. Cross applied a negative adjustment of 10% for the comparable's status as a current listing, a negative adjustment of 15% for the comparable's superior location, and a negative adjustment of 5% for its smaller size.  Additionally, she applied positive adjustments of 15% for the comparable's inferior water frontage/view and 15% for its inferior water depths.  This comparable did not have water frontage, but had all municipal utilities.  With her adjustments, Ms. Cross's value for Comp #6 was $17,668.

Comp #7 was also a listing (listed in December 2013) for 25.77 usable acres (27.13 gross acres) in Pamlico County for $38,805 per usable acre ($36,860 per gross acre).  Ms. Cross applied a negative adjustment of 10% for the comparable's status as a current listing, a negative adjustment of 15% for the comparable's superior location, a negative adjustment of 5% for the comparable's smaller size, a negative adjustment of 10% for the comparable's superior water frontage/view, and a negative adjustment of 10% for the comparable's superior water depths/accessibility.  Finally, Ms. Cross applied a positive adjustment of 5% for the comparable's inferior utilities.   With her adjustments, Ms. Cross valued Comp #7 at $22,701.

Comp #8 was a 2012 sale for 44.03 usable acres (58.5 gross acres) in Craven County  for $13,059 per usable acre ($9,829 per gross acre).  Ms. Cross applied a negative adjustment of 5% for the comparable's superior location and a negative adjustment of 5% for its smaller size.  She applied

a positive adjustment of 5% for the comparable's inferior utilities, a positive adjustment of 5% for the comparable's inferior access, a positive adjustment of 10% for the comparable's inferior water frontage/view, and a positive 15% adjustment for its inferior water depths. With her adjustments, Ms. Cross valued Comp #8 at $16,324.

Comp #9 is the same as Comp #3 from Ms. Cross's Broad Creek tract appraisal. Ms. Cross applied a negative 5% adjustment for the comparable's superior location, a positive adjustment of 5% for the comparable's inferior utilities, a positive adjustment of 15% for the comparable's inferior water frontage/view, and a positive adjustment of 15% for the comparable's inferior water depths. With her adjustments, Ms. Cross valued Comp #9 at $22,346.

Comp #10 was a 2008 sale for 25.1 usable/gross acres in Beaufort County for $26,892 per acre. Ms. Cross applied a negative adjustment of 5% for the comparable's superior location and a negative adjustment of 5% for its smaller size, along with a negative 27% adjustment for market conditions. She applied a positive adjustment of 5% for the comparable's inferior utilities, a positive adjustment of 5% for its inferior water frontage/view, and a positive adjustment of 5% for its inferior water depths/accessibility. With her adjustments, Ms. Cross valued Comp #10 at $20,582. After reconciling all her adjustments, Ms. Cross reached a value of $18,500 per usable/upland acre, and $500 per wetland acre for J031-81. Rounded, Ms. Cross's ultimate valuation for J031-81 was $1,458,400.

Ms. Cross used another three comparables in her valuation of J031-82, the 7.2 acre tract. Comp #11 is a 2012 sale of 14.1 acres in Pamlico County for $2,766 per acre. Ms. Cross applied a positive adjustment of 5% to the comparable for its larger size, and a positive adjustment of 10% for its lack of available utilities. This comparable had electricity and telephone. With these

adjustments, Ms. Cross valued Comp #11 at $3,181.  Comp #12 is a 2012 sale of 4.9 usable acres (5.9 gross acres) in Pamlico County for $5,102 per usable acre ($4,941 per gross acre).  To this value, Ms. Cross applied a negative adjustment of 2% for the comparable's smaller size, and a positive adjustment of 5% for its lack of available utilities.  With her adjustments, Ms. Cross valued Comp #12 at $5,102.  Comp #13 was a 2010 sale of 10.06 acres in Pamlico County for $6,710 per acre.  Ms. Cross applied a positive adjustment of 2% for the comparable's larger size and a positive adjustment of 5% for its inferior utilities.  With her adjustments, Ms. Cross valued Comp #13 at $6,710.  Ms. Cross reached an ultimate value of $5,000 per acre for a total value of $36,000 for J031-82.

As stated in its discussion of the Broad Creek tract, the court gives great weight to Ms. Cross's adjustments and ultimate valuation, but finds that additional adjustments are warranted to yield a conservative valuation.  First, the court will apply an additional negative adjustment to account for the limited county funds available to add sewer service to the tracts, and the likelihood that a purchaser or developer will have to bear that cost.  The court will also apply an additional negative adjustment to account for the abundance of unsold lots on the market that indicate the state of the market and the quantity of lots that will be in competition with the subject.  In addition to this adjustment, the court further discounts the value to account for the length of time the listings have been on the market, although the court has also considered the anticipated population increase, further stabilization of the market and the desirable location of the tract.

Ms. Cross's valuation of the three Bay River/Smith Creek tracts totals $6,800,000.  With the court's additional adjustments, the court calculates the value in the following manner: $15,000 per usable/upland acre and $500 per wetland acre on tract J04-11 for a total of $4,423,100; $15,500 per

upland acre and $500 per wetland acre on tract J031-81 for a total value of $1,222,300; and $4,500 per acre on tract J031-82 for a total value of $32,400, and for an aggregate rounded present value of $5,700,000.

The total value for the Broad Creek tract and the Bay River/Smith Creek tract is **$ 8,843,000**. Inasmuch as that value is less than the lower end of the range of the amount of BLC's secured claim, the surrender of those tracts cannot, by definition, constitute the indubitable equivalent of BLC's claim. Therefore, the court need go no further in the analysis at this time. The debtor's plan contemplated the possibility that surrender of the Broad Creek and Bay River/Smith Creek tracts would not be found by the court to give BLC the indubitable equivalent of its secured claim, and provides that in this event, the court is to value the remaining collateral tracts, after which the debtor shall decide whether it will surrender additional tracts and/or amortize the remainder of the claim. The court declines to accept the debtor's invitation to value the remaining 10 tracts, and instead suggests that the debtor be guided by the methodology used by the court in valuing the Broad Creek and Bay River/Smith Creek tracts in its own determination of how many and which additional properties to surrender, if that is the option it selects.

In order for the debtor to make an informed decision regarding which additional properties to surrender, it is necessary for the amount of BLC's secured claim to be determined. Using BLC's values for the remaining tracts comprising its collateral, and adding those to the court's value of $8,843,000 for the Broad Creek and Bay River/Smith Creek tracts, the court finds that BLC is fully secured, thus entitling it to accrue interest and costs on its claim.[21] The question of what interest rate

---

[21]Mr. Moody's appraisals of the remaining tracts comprising BLC's collateral find an aggregate value of $8,489.940.

applies still remains, and the court will set a hearing on the debtor's objection to the BLC claim to determine whether the contract or default rate is applicable.  After the court enters an order determining the interest rate, the debtor will have 21 days in which to select additional properties to surrender and/or opt to amortize the remainder of the claim.  Finally, in light of the court's determination that BLC is fully secured, BLC's motion for relief from stay is denied.

      **SO ORDERED**.

**END OF DOCUMENT**
