**SO ORDERED.**

**SIGNED this 25 day of November, 2015.**

*Stephani W. Humrickhouse*

**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

IN RE:                                                           CASE NO.

**BATE LAND & TIMBER, LLC**                                      **13-04665-8-SWH**

       DEBTOR

### MEMORANDUM OPINION REGARDING PRIOR ORDER ON OBJECTION TO CLAIM AND APPLICATION FOR COMPENSATION OF BATE LAND COMPANY, FINDING INDUBITABLE EQUIVALENCE, AND CONFIRMING PLAN

This order is the fourth and last in a series of orders leading up to confirmation of the debtor's chapter 11 plan of reorganization. In this order, the court will set out the reasoning underlying its short order dated August 25, 2015 (the "Short Order"), then complete its discussion and analysis of confirmation of the debtor's plan of reorganization.

### Overview and Incorporation of Prior Orders

First, the court picks up where it left off: In its most recent order, the Short Order entered on August 25, 2015, the court resolved the dispute between the debtor and creditor Bate Land Company ("BLC") as to whether, and in what amount, BLC was entitled to post-petition interest and

attorneys' fees.  That order, which was entered to facilitate the parties' completion of the confirmation process with a hearing on the two remaining issues (feasibility under 11 U.S.C. § 1129(a)(11) and whether the plan fairly and equitably treated the BLC claim under § 1129(b)(2)(A)(iii)), stated that the bases for the court's ruling would be set out in a subsequent order.  See Order Regarding Objection to Claim and Application for Compensation of Bate Land Co., Doc. No. 481.  That discussion is set out below and outlines the methodology by which the court determined the amounts recoverable by BLC for attorneys' fees under § 506(b) and post-petition interest at the non-default contract rate, as well as the time periods applicable to calculation of post-petition interest.  The court ultimately arrived at an allowed secured claim of $14,606,084.35.[1]

This order specifically incorporates by reference the Short Order, as well as two other orders which together form the basis for confirmation of the debtor's plan of reorganization.  Specifically, the court's order dated January 15, 2015 set forth the framework of the court's conservative methodology in valuing land proffered under the debtor's proposed amended plan and the procedures for determining indubitable equivalence.[2]  See Order dated January 15, 2015, Doc. No. 306.  The order dated May 1, 2015 and the Short Order determine the value of previously proffered land and the amount of BLC's allowed secured claim.  See Order dated May 1, 2015, Doc. No. 380; Order Regarding Objection to Claim and Application for Compensation of Bate Land Co., Doc. No. 418.

---

[1]See footnote 3.

[2]The January 15, 2015 order is on appeal to the District Court for the Eastern District of North Carolina, as well as the August 25, 2015 Short Order.

Subsequent to entry of the Short Order, and with all valuations complete, the court conducted hearings on feasibility and to determine whether the plan was fair and equitable in light of the debtors' proposed cash treatment of BLC's claim. At the conclusion of the hearing on October 26, 2015, the court ruled (and announced the bases for its ruling) from the bench, finding that the debtor's plan is feasible and provides fair and equitable treatment of BLC's claim.

## DISCUSSION

I.    **Bases for Prior Ruling on Debtor's Objection to Claim of BLC & BLC's Application for Compensation**

The Short Order sets out the court's rulings with respect to three issues arising out of the debtor's objection to the claim of BLC, and BLC's application for compensation: (1) reasonable attorneys' fees under § 506(b); (2) allowance of post-petition interest at the non-default contract rate, rather than the default rate; and (3) the equitable grounds for reducing the award of post-petition interest. In the order, the court concluded that BLC was entitled to a secured claim in the amount of $14,606,084.35[3] and comprised of principal in the amount of $11,048,260.05; pre-petition interest at the non-default contract rate of $1,876,157.82; post-petition interest through September 1, 2015 at the non-default contract rate of interest for a period of 764 days in the amount of $1,356,666.54; and attorneys' fees in the amount of $325,000.00. With the inclusion of other non-legal professional

_____

[3]The Short Order mistakenly set out the amount of BLC's secured claim as $14,606,084.35. This calculation was in error, as the correct calculation of principal, pre-petition interest, post-petition attorneys' fees and post-petition interest should have been $14,606,084.41. Additionally, the court omitted from this figure reimbursement for professional fees to which BLC is entitled; namely, appraiser's fees and costs of $47,744.07, forester's fees and costs of $19,251.01, and timber consultant's fees of $12,000.00. There were no objections to these amounts, and the court deems them to be properly included in the claim. Although this increases the amount of the cash component to be paid under the debtor's plan, this relatively minor change does not impact the court's finding that the plan is feasible, and that it fairly and equitably treats the BLC claim.

3

fees and costs in the amount of $78,995.08,[4] which were mistakenly omitted from the Short Order's calculation, see footnote 3, the correct amount of BLC's secured claim is $14,685,079.49.   In calculating the amount of post-petition interest, the court applied an equitable reduction.  The bases for those determinations are set out below.

### A.  Attorneys' Fees under § 506(b)

On February 13, 2015, BLC filed its application for reimbursement of post-petition attorneys' fees and expenses incurred through January 20, 2015 in the amount of $739,723.01,[5] which included attorneys' fees in the amount of $695,047.50 and legal expenses in the amount of $59,692.47.  The foregoing fees and expenses were incurred by BLC's legal counsel in this matter, Stubbs & Perdue, P.A.  BLC contends that it is entitled to reimbursement under § 506(b) by virtue of its secured status, because the loan documents provide for such recovery, and because the fees and costs were reasonably and necessarily incurred in protecting its rights and interests in collateral.  The debtor and the bankruptcy administrator ("BA") each object to the fee request on reasonableness grounds, primarily asserting that the time entries were unnecessarily duplicative and excessive, especially compared to the fees incurred by the debtor.  Additionally, the debtor asserts that BLC is entirely prevented from recovering attorneys' fees because there was no default under the parties' agreement, and because BLC failed to comply with the statutory notice requirement of N.C. Gen. Stat. § 6-21.2(5).

---

[4]This includes the fees and costs of BLC's appraiser, forester and timber consultant.

[5]See footnote 3; this figure is exclusive of the fees and costs of BLC's appraiser, forester and timber consultant.

Oversecured creditors may recover post-petition attorneys' fees, costs and expenses as part of their secured claim pursuant to § 506, which provides:

> To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

§ 506(b).  To show entitlement to post-petition fees and expenses, a creditor must show that: "(a) the creditor is oversecured; (b) the underlying agreement provides for such fees and costs; and (c) the fees and costs are reasonable."  In re Gwyn, 150 B.R. 150, 154 (Bankr. M.D.N.C. 1993).  The court retains broad discretion in determining the amount of fees and expenses to be allowed under § 506(b).  Id.

As far as the court is concerned, there is no real dispute that BLC is oversecured,[6] but the debtor contends that attorneys' fees are not permitted under the terms of the Note because there was no default.  The debtor posits that because it filed for bankruptcy within the ten-day grace period after its initial default[7] and BLC did not provide it with notice of its right to cure, the automatic stay prevented a declaration of default.  The debtor appears to equate BLC's right to declare a default with the event of default itself.  In contrast, BLC argues that a default under the Note is defined as a failure to make payment, and occurs prior to the expiration of the ten-day cure period.  BLC further asserts that the cure provision has no impact on the attorney fee provision, and simply acts as a prohibition on BLC taking action to collect on the debt prior to its expiration.

The pertinent attorneys' fee provision of the Note provides as follows:

---

[6]This is so although BLC has maintained throughout this case that it is undersecured.  See Debtor's Trial Exhibit 19b (summarizing appraisals of remaining tracts of collateral).

[7]There appears to be no dispute that a payment default occurred.

> *Upon default* the holder of this Note may employ an attorney to enforce the holder's rights and remedies and the maker, principal, surety, guarantor and endorsers of the Note hereby agree to pay to the holder reasonable attorney's fees not exceeding a sum equal to fifteen percent (15%) of the outstanding balance owing on said Note, plus all other reasonable expenses incurred by the holder in exercising any of the holder's rights and remedies upon default.

Ex. A to BLC's Memo in Support of Fee Application, Doc. No. 370 at 2 (emphasis added).  The Note refers to a "default" as a "default in payment" or a "default under the terms of any instrument securing this Note."  Id.

The court finds that the language of the Note is consistent with BLC's interpretation.  The Note specifically refers to the failure to make a payment as a default, and does not condition recovery of attorneys' fees on the expiration of the cure period or a declaration of default.  As such, a default occurs regardless of cure and regardless of a declaration of default.  Because the Note explicitly provides BLC with the right to attorneys' fees upon default, the fact that the debtor filed for bankruptcy prior to the end of the ten-day cure period has no impact on BLC's right to fees.

Next, the court turns to the debtor's argument that BLC cannot recover post-petition attorneys' fees because it failed to comply with the notice requirements of N.C. Gen. Stat. § 6-21.2.  The U.S. Court of Appeals for the Fourth Circuit rejected this argument in Unsecured Creditors' Comm. 82-00261c-11A v. Walter E. Heller & Co. Southeast, Inc. (In re K.H. Stephenson Supply Co.), 768 F.2d 580 (4th Cir. 1985), in which it adopted the majority view that attorneys' fees are recoverable as part of a secured claim under § 506(b) notwithstanding contrary state law.  768 F.2d at 583 (specifically considering N.C. Gen. Stat. § 6-21.2).[8]  Further, the debtor's reliance on and

---

[8]There is extensive precedent consistent with the Fourth Circuit's view.  See JP Morgan Chase Bank v. ELL 11, LLC, 414 B.R. 881, 884 (M.D. Ga. 2008) ("[T]he [Eleventh Circuit] concurred with the four other circuits that have addressed the [relation between state law enforceability and § 506(b)] by concluding that contractual enforceability under state law, or lack

6

citation to Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Inc.), 167 F.3d 843 (4th Cir.

1999), is misplaced; that case involved attorneys' fees under § 365 rather than § 506(b), and

therefore is not relevant to the court's analysis.  Additionally, the Shangra-La court itself recognized

the meaningful distinction between these two sections of the Code, stating that the language of

§ 506(b) "indicate[s] clear congressional intent to displace state law to the extent that it might be

contrary to the written agreement."  167 F.3d at 851, n.8.[9]  Because BLC was not required to comply

with N.C. Gen. Stat. § 6-21.2, any failure to do so is not fatal to its application for post-petition

attorneys' fees under § 506(b).

   Having determined that the Note affords BLC the right to attorneys' fees, the court next must

consider whether the requested fees and expenses are reasonable.  The reasonableness limitation

found in § 506(b) serves to prevent squandering of estate assets by oversecured creditors who "fail

to exercise restraint in the attorneys' fees and expenses they incur, perhaps exhibiting excessive

caution, overzealous advocacy and hyperactive legal efforts."  Gwyn, 150 B.R. at 155.  It has been

said that the key determinant is whether the creditor engaged in "actions that similarly situated

_____

thereof, does not negate the applicability of the § 506(b) reasonableness standard.") (citing In re
Welzel, 275 F.3d 1308, 1315 (11th Cir. 2001)); First W. Bank & Trust v. Drewes (In re Schriock
Constr., Inc.), 104 F.3d 200 (8th Cir. 1997); Blackburn-Bliss Trust v. Hudson Shipbuilders, Inc.
(In re Hudson Shipbuilders, Inc.), 794 F.2d 1051 (5th Cir. 1986); Joseph F. Sanson Inv. Co. v.
268 Ltd. (In re 268 Ltd.), 789 F.2d 674 (9th Cir. 1986); Colliers ¶ 506.04[3][b] (legislative
history shows that attorneys' fees are allowed despite such fees being unenforceable under state
law; most courts hold that federal law applies over state law); but cf. In re F & G Leonard, LLC,
Case No. 11-01297-8-JRL, 2011 WL 5909463 (Bankr. E.D.N.C. Oct. 21, 2011) (requiring
compliance with state law conditions precedent; relying on Independence Nat'l Bank v. Dye
Master Realty, Inc. (In re Dye Master Realty, Inc.), 15. B.R. 932, 935-36 (Bankr. W.D.N.C.
1981), a case prior to Heller, 768 F.2d 580).

   [9]The Shangra-La court further stated that § 365(b)(1)(B) does not create an independent
right to attorneys' fees, whereas § 506(b) does create such a right.  167 F.3d at 849, 851 n.8.

creditors might reasonably conclude should be taken." In re F.B.F. Indus., Inc., Case No. 91-24613DWS, 1995 WL 691893, at *4 (Bankr. E.D. Penn. Nov. 15, 1995) (quoting Dalessio v. Dalessio (In re Dalessio), 74 B.R. 721, 723 (B.A.P. 9th Cir. 1987)) (internal quotations omitted).

In conducting the reasonable fee inquiry, the court is guided by the twelve factors enumerated in Barber v. Kimbrell's, Inc., 577 F.2d 216 (4th Cir. 1978), which the Fourth Circuit adopted from Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). See In re Steel Network, Inc., Case Nos. 09-81230, 09-81231, 2011 WL 4002206, at *5 (Bankr. M.D.N.C. June 27, 2011). The Johnson factors are as follows: (1) time and labor required; (2) novelty and difficulty of the issues; (3) skill required to properly perform the service; (4) preclusion of other employment due to acceptance of the case; (5) customary fees; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) amount involved and the results obtained; (9) experience, reputation and ability of the attorneys; (10) undesirability of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases. Id. (citing Johnson, 488 F.2d at 717-19). The proper procedure is to first calculate the lodestar figure, using the Johnson factors to come up with a reasonable hourly rate and reasonable number of hours. Id. at *5 (quoting Daly v. Hill, 790 F.2d 1071, 1078 (4th Cir. 1986)). This figure results in a presumptively reasonable and fully compensatory fee award. Id. The applicant bears the burden of proving reasonableness. Steel Network, 2011 WL 4002206, at *6. The court will refer to a number of the Johnson factors that are relevant to the present fee request.

The first Johnson factor, the time and labor required in the case, involves considering whether the work performed was legal work and whether the time spent was reasonable, including the extent to which any services were unnecessarily duplicative or ministerial. Id. Although not

8

dispositive, the number of hours and amount of fees billed by the debtor's counsel is relevant for purposes of comparison and provides "at least some evidence of the scope of the litigation and the significance of the issues." In re Villa Capri of Ga. Assocs. Ltd. P'ship, 141 B.R. 257, 264 (Bankr. N.D. Ga. 1992); see also In re Digital Products Corp., 215 B.R. 478, 482 (Bankr. S.D. Fla. 1997); Davidson Metals, Inc., 152 B.R. at 920; In re Wire Cloth Products, Inc., 130 B.R. 798, 814 (Bankr. N.D. Ill. 1991).

In this case, the time and labor factor is both a particularly relevant factor and also a point of dispute. Both the debtor and the BA maintain that the fee application is unreasonable in that it contains duplicate entries, and because BLC unnecessarily staffed multiple attorneys. BLC contends that this factor weighs in its favor because multiple tracts of property had to be valued and counsel had to attend numerous hearings. BLC argues further that comparing its fees with those of the debtor is unfair, as it had to engage in additional discovery to adequately protect its interests.

Upon review of the fee application and analysis of the time and labor involved in this case, the court has determined that a significant reduction is warranted. BLC's fee application contains numerous instances of duplicative billing, especially with regard to research, preparing for and attending hearings, and attending conferences. The attendance at multiple day-long hearings is particularly noteworthy. For example, BLC had three attorneys attend the debtor's 341 meeting, various conferences,[10] and multiple hearings.[11] Four attorneys were actually present at certain other

---

[10] A nonexclusive list of the dates on which BLC billed for three attorneys at conferences includes February 3, 2014; February 10, 2014; and February 11, 2014. Three attorneys attended a deposition on February 6, 2014.

[11] A nonexclusive list of hearing dates on which BLC billed for the presence of three attorneys includes March 24, 2014; April 28, 2014; April 29, 2014; April 30, 2014; and May 1, 2014.

hearings, sometimes resulting in corresponding daily billings of more than $10,000.00.[12] In contrast, only one attorney appeared on behalf of the debtor at all but two hearings involving BLC throughout the entire case. Ex. B to Debtor's Objection to Fee Application, Doc. No. 358 at 8.

Not surprisingly, the presence of multiple attorneys working on this matter for BLC resulted in astronomical billings. For instance, counsel billed at least 18 hours for reviewing transcripts in connection with closing arguments, and spent a total of 42 hours, spread across three attorneys, preparing for closing arguments in May 2014. Counsel for BLC billed more than double the number of hours billed by the debtor's attorney during the eighteen month period covered by the fee application, outnumbering the debtor's attorney by some 1,259.8 hours. Ex. C to Debtor's Objection to Fee Application, Doc. No. 358 at 9. During the fee period, the debtor's counsel handled not only issues related to BLC's claim but also various issues associated with representing a reorganizing debtor. BLC's assertion that it had to engage in "additional discovery" to protect its interests is not persuasive. BLC was as familiar with the collateral as the debtor itself, having been its previous owner.

The court does not doubt that the services were actually performed by counsel for BLC in furtherance of its client's interests, and assumes that BLC requested these services and is amenable to paying for them. However, just because a creditor authorizes legal work does not mean that a debtor should pay for it, and fees attributable to "overlawyering" are neither properly billed to nor paid by the debtor. In re Davidson Metals, Inc., 152 B.R. 917, 921 (Bankr. N.D. Ohio 1993). Given the numerous instances of duplication and manifestly evident overlawyering in this case, the court

---

[12]A nonexclusive list of hearing dates on which BLC billed for the presence of four attorneys is: February 24, 2014 and March 17, 2014.

will reduce BLC's fee award accordingly.  See Steel Network, 2011 WL 4002206, at *7 (finding it unreasonable that five different attorneys in one office worked on the matters, which resulted in overlapping involvement and numerous inter-office conferences); In re McCormick, 417 B.R. 372, 375 (Bankr. M.D.N.C. 2008) (should disallow fees for services involving unnecessary duplication); In re Green Valley Beer, 281 B.R. 253, 258 (Bankr. W.D. Penn. 2002) (firm used six different attorneys, half of whom billed more than 50 hours of work, and also included work that could have been done by paralegals at a lower rate); Citicorp Savings of Fla., a Fed. Savings and Loan Assoc. v. Oliver (In re Oliver), 183 B.R. 87, 92 (Bankr. W.D. Penn. 1995) (unnecessary and unreasonable to employ firm whose services consisted almost entirely of conferences and correspondence with local counsel and reviewing local counsel's work).  The court emphasizes that BLC's counsel has provided it with competent, professional and all-around excellent representation.  That said, the bulk of the fees associated with that representation should not be assessed against the debtor.

The application also seeks reimbursement for several instances of ministerial, rather than legal, work that is not properly billed to the debtor.  Examples of ministerial work billed for in the fee application include: communicating with courtroom staff; organizing files; reviewing deadlines and scheduling; filing pleadings and preparing notices; reviewing the docket; and requesting transcripts.  See McCormick, 417 B.R. at 375 (disallowing fees for purely ministerial services); In re Ward, 190 B.R. 242, 248 (Bankr. D. Md. 1995); Davidson Metals, 152 B.R. at 921.

The second Johnson factor focuses on the novelty and difficulty of the work involved.  As in Steel Network, 2011 WL 4002206, this is a contentious case involving various objections, motions and hearings where the parties were vehemently at odds.  The court recognizes that these circumstances may, in some instances, explain the use of multiple attorneys and the number of hours

11

billed, but they do not justify charging the debtor for services that are duplicative or ministerial. Furthermore, had the novelty and difficulty of the circumstances of the case been the catalyst for BLC's extremely high billing, the court would expect a comparable level of billing by the debtor, but that clearly is not the case. In fact, the debtor's counsel billed less than half of what BLC's counsel billed during the same time period, while handling not only issues related to BLC's claim but also multiple other issues associated with representing a reorganizing debtor. So, while the litigation is sophisticated, such sophistication should not have translated into the amount of fees requested by BLC. Those same issues were handled competently and much more economically by the debtor's counsel. This factor further justifies an appropriate adjustment to BLC's fee award.

The third Johnson factor is the skill required to perform the legal services at issue. The court recognizes that a high degree of skill is required to competently litigate a challenging chapter 11 case, but again, the extreme disparity between the hours billed by counsel for the debtor and BLC is telling. The court cannot say that the degree of skill required of BLC's counsel was any greater than that required of debtor's counsel. Given the similar legal issues faced and the similar levels of experience and qualifications of the respective counsel, the disparity in hours billed indicates that the hours billed by BLC are not reasonable.

The court will next consider the fifth Johnson factor, the customary fee for similar work in the community. The relevant market is the community in which the presiding court sits. Steel Network, 2011 WL 4002206, at *9. In this case, the relevant community is the Eastern District of North Carolina. The hourly fees billed by BLC's counsel ranged between $250.00 to $425.00, with the bulk of the work being performed by attorneys billing $300.00 or more. The determination of prevailing hourly rates may be based upon personal knowledge of the court. Id. at *10. The court

finds that the counsel employed by BLC has a great deal of experience in bankruptcy matters, and based upon its own experience, finds that the rates fall within the range of rates charged for similar services in the community.  See Villa Capri of Ga., 141 B.R. at 262.  Similarly, jumping ahead to the ninth Johnson factor, the skill, experience and reputation of the chosen counsel supports the hourly rates charged.

The seventh Johnson factor assesses time limitations imposed by the client or the circumstances, and recognizes that priority work that delays other legal work is entitled to some premium.  Steel Network, 2011 WL 4002206, at *10.  BLC urges that its fees and use of multiple attorneys is justified based on the truncated time it had to prepare for hearings, but presented no evidence that its attorneys' involvement in this case caused delays to other legal projects.  While these alleged time constraints might explain why BLC may have used more attorneys and billed more hours during certain months, it certainly does not justify the continued pattern of significantly high billing throughout the duration of BLC's involvement in the case.  BLC billed more hours than the debtor's attorney – someone subject to the very same case time restraints – in fifteen out of the seventeen months covered by the fee application.  Ex. C to Debtor's Objection to Fee Application, Doc. No. 358 at 9.  During those fifteen months, BLC billed on average 5.4 times more hours than the debtor's counsel.  Id.  As noted above, in total, BLC billed 1,259.8 more hours than the debtor during this same time period.  Finally, the court does not accept BLC's premise that there were reduced time periods involved in this case – if anything, this case involved delays.  The debtor's petition was filed on July 26, 2013, and the final hearing on confirmation occurred on October 26, 2015 – some 822 days later.  This is hardly a fast track case requiring litigants to perform under tight schedules, and BLC's allegation that this factor should weigh in its favor is somewhat bewildering.

13

BLC also maintains that the eighth Johnson factor, the amount involved and the results obtained, supports the reasonableness of its fee application because its claim involves a much greater debt and much more valuable collateral than prior dirt-for-debt cases. The court could not disagree more. Though the legal concepts involved in dirt-for-debt cases, particularly valuation and indubitable equivalence, are sophisticated, the degree of sophistication is the same whether the amount in controversy is $10,000.00 or $60,000,000.00. A *client* may be willing to spend more to protect a more valuable asset, but that does not mean the legal fees should be automatically passed on to the *debtor*.

Two additional factors are routinely considered by courts in analyzing fee applications: lumping and inadequate records. Lumping occurs when multiple services are listed as a single time entry, making it impossible for the court to determine how much time was dedicated to the specific tasks involved. Lumping is "universally disapproved" by bankruptcy courts. In re Staggie, 255 B.R. 48, 55 (Bankr. D. Idaho 2000) (quoting In re Automobile Warranty Corp., 138 B.R. 72, 76 (Bankr. D. Colo. 1991)) (internal quotations omitted). When presented with a fee application including lumped time entries, courts generally take one of two approaches: some deny each lumped entry in its entirety, while other courts make a percentage adjustment. In re Pearson, Case No. 00-1086012, 2001 WL 1699657, at *5 (Bankr. M.D.N.C. Jan. 26, 2001); see also Green Valley Beer, 281 B.R. at 259. This factor is relevant here because the time sheets included in the fee application involve numerous instances of lumping.

Lumping hinders courts from determining reasonableness, which is why it goes hand in hand with the principal that a vague or inadequate record will warrant adjustments to the award. See Green Valley Beer, 281 B.R. at 259 (recourse is premised on the applicant's failure to sustain its

burden of proving reasonableness). Billing entries may not be descriptive enough to justify an award if services are lumped together or the record is vague. See Davidson Metals, 152 B.R. at 920 (disallowed portion of fees that were nondescriptive). Here, portions of BLC's fee application are inadequate in that they lack sufficient detail and contain nondescript time entries, such as "research issues," or "phone conferences." See Ward, 190 B.R. at 247 (disallowed compensation for vague phrases, such as "prepare correspondence"); Wire Cloth Products, 130 B.R. at 814 (entries omitted nature or purpose of phone calls or identies of parties to call).

With respect to the debtor's and the BA's objections to BLC's expenses, the court agrees that certain of BLC's hotel expenses during April 2014 are unreasonable and may not be charged to the debtor. Specifically, the $1,010.71 meeting room expense at a Marriott in downtown Raleigh over the course of a four-day hearing is unreasonable given that BLC's counsel has a Raleigh office and the courthouse, located only a few blocks away, offers free meeting rooms.

Accordingly, based on the foregoing, the court determines that the appropriate[13] amount of post-petition attorneys' fees and expenses to be awarded to BLC is $325,000.00.[14] This figure, the court notes, is still significantly greater than the amount of fees billed by the debtor's attorney during the same time period.[15]

---

[13]It is not necessary or efficient for the court to engage in an analysis of every reduction on a dollar-for-dollar basis, and it is appropriate for a general reduction to be made. See Pearson, 2001 WL 1699657, at *6 ("The court has broad discretion in determining whether the proposed fees and costs are reasonable.").

[14]This figure is in addition to the allowed professional fees and costs for BLC's appraiser, forester and timber consultant in the amount of $78,995.08.

[15]The debtor's attorney billed for legal fees and expenses in the amount of $281,983.58 during the same period.

B.      *Post-Petition Interest at the Non-Default Contract Rate*

Next, the court turns to whether BLC's claim for post-petition interest must be calculated at the contractual default rate of interest.  The debtor contends that the Note only allowed for default interest upon the expiration of a ten-day grace period following default, written notice from BLC to the debtor of default, and the expiration of an additional fifteen-day cure period following notice.  Because the debtor filed its bankruptcy petition prior to the expiration of the ten-day grace period, the debtor maintains that the automatic stay prevented BLC from issuing notice, and thus, the default rate did not become applicable.  Additionally, the debtor asserts that the default rate of interest is inequitable under the circumstances and must be disallowed on that basis.

The court looks first to the pertinent language of the Note to determine if the prerequisites for applying the default rate were satisfied.  In doing so, it must read the language of the Note in context and in light of its plain meaning.  In re Deep River Warehouse, Inc., Case No. 04-52749, 2005 WL 1513123, at *5 (M.D.N.C. June 22, 2005).  The Note provides that a default rate of interest of twelve percent "shall" apply "after default."  Absent default, the non-default contract rate of interest of nine percent applies.  The Note does not contain language specifically requiring BLC to give notice in order for default interest to accrue, but does require notice to accelerate the unpaid principal and interest.

While the debtor cites cases for the proposition that the automatic stay prevented BLC from issuing notices of default, it cites no cases adopting its interpretation of the contract, and the plain terms of the Note do not impose any such requirement.  Had the parties intended for default interest to accrue only upon notice or expiration of a cure period, they would (or should) have included language to that extent.  Accordingly, the court finds that BLC's failure to give notice does not bar

16

its request for default interest.  See Deep River Warehouse, 2005 WL 1513123, at *5 (finding that creditor was not required to give notice of intent to charge default interest; distinguishing from other cases where default rate was included in provision dealing with acceleration of the debt and not part of a separate provision).

As BLC correctly points out, § 506(b) allows oversecured creditors to recover interest on their claims to the extent of the value of the collateral.  § 506(b).  Under § 506(b), the contractual rate, which may include a default rate provision, is presumptively valid and applies unless the equities provide otherwise.  In re Dixon, 228 B.R. 166, 172-73 (W.D. Va. 1998).  To rebut this presumption, the debtor must prove that the equities weigh in favor of its objection.  In re Ace-Texas, Inc., 217 B.R. 719, 723 (Bankr. D. Del. 1998).  This involves a case-by-case, fact specific inquiry.  Deep River Warehouse, 2005 WL 1513123, at *3.  Courts have utilized a variety of factors in undertaking the analysis, reflecting the principle that "[t]he very purpose of equity is to exalt the individual circumstances of a case over law's hard and fast rules."  In re Southland Corp., 160 F.3d 1054, 1060 (5th Cir. 1998).

Although the analysis certainly is not limited to the following factors, federal courts in North Carolina have highlighted four factors as being indicative of whether the default rate of interest is proper: (1) the creditor faces significant risk of nonrepayment; (2) the non-default contract rate of interest is not the prevailing market rate; (3) the differential between the default and pre-default rates is reasonable; and (4) the purpose of the default rate is to compensate the creditor for losses sustained as a result of the default, and not simply a disguised penalty.  Deep River Warehouse, 2005 WL 1513123, at *3; see also In re Parker, Case No. 12-03128-8-SWH, 2014 WL 6545025, at *3 (Bankr. E.D.N.C. Nov. 19, 2014), rev'd in part on other grounds, Case No. 5:15-CV-25-F, 2015 WL

17

5553767.  Additional factors recognized by courts include evidence that the creditor engaged in obtrusive tactics that result in delay, as in In re W.S. Sheppley & Co., 62 B.R. 271, 281 (Bankr. N.D. Iowa 1986); whether allowance of the default rate will harm junior creditors, as in Southland, 160 F.3d at 1060; and the default rate's relation to actual or projected loss, as in In re DWS Investments, Inc., 121 B.R. 845, 849 (Bankr. C.D. Cal. 1990).

Here, the court notes first that the differential between the default and non-default rate of interest of three percentage points is relatively small and is within the range found reasonable by courts.  Additionally, BLC presented evidence at the July 8, 2015, hearing that the non-default contract rate of interest was the prevailing rate at the time the Note was originated.  See Ace-Texas, 217 B.R. at 724 (relevant time is the time of the transaction).  These two factors support finding that application of the default rate is equitable.

However, there are additional factors, some unique to this case, that are more compelling under the present circumstances and persuade the court that application of the default rate would be inequitable.  See W.S. Sheppley & Co., 62 B.R. 271 (disallowing default rate based on equitable considerations despite small differential between non-default rate of 9.27% and default rate of 12%). First, and perhaps most importantly, it cannot be said that BLC has ever faced any significant risk of nonpayment.  The original debt was in the amount of $65,000,000.00 and was secured by twelve tracts of development/recreational land and a conglomerate of multiple timber tracts of land.  See Debtor's Trial Exhibit 19b.  As part of BLC's financing agreement with the debtor, it agreed to release back tracts for specified sums (the "Release Prices").[16]  Ex. B to BLC's Response to Debtor's

---

[16]Although the Release Prices are not dispositive of value, and clearly not dispositive of value at confirmation, see Order dated December 4, 2013, the court notes that the surrendered properties alone had Release Prices totaling $14,620,058.00.  See Debtor's Trial Exhibit 19b.

First Objection to Claim, Doc. No. 68 at 37.  At the time of the debtor's bankruptcy filing, the debtor already had paid back roughly $60,000,000.00 on the original $65,000,000.00 debt, and the undisputed amount of BLC's claim, including unpaid principal and interest at the non-default rate, was $12,924,417.87.  On the petition date, that debt remained secured by eighteen tracts of land – including eleven development/recreational tracts and seven timber tracts – with Release Prices totaling $31,438,946.00.[17]  Debtor's Trial Exhibit 19b.[18]  As previously determined by the court, the value of the collateral surrendered to BLC is $13,708,000.00, which leaves a deficiency balance of $977,079.49.  The value of the remaining tracts of collateral, after accounting for the surrendered collateral, is far in excess of the deficiency balance.  BLC's most recent appraised value of the remaining collateral is $7,823,856.00, and the Release Prices total $16,818,888.00.  Id.  Second, BLC has not enunciated a persuasive justification for the default rate of interest or shown a reasonable relationship between projected costs and expenses and the default rate.  To the contrary, at the hearing on July 8, 2015, a representative of BLC testified that he did not know why the default rate was imposed or why it was needed.  The lack of purposeful justification for the default rate would not be determinative by itself, but it certainly is supportive of its denial.

The court finds significant the fact that at multiple times throughout the pendency of this case, the debtor, in a focused effort to halt the accrual of crippling interest, attempted to deed back

---

These values give further support to the court's determination of indubitable equivalence, and as a result, that BLC has received fair and equitable treatment.

[17]This figure does not include the value of the Mallory Creek tract, for which a value was not listed on the Debtor's Trial Exhibit 19b.

[18]The court takes note of the fact that BLC's November 17, 2013 appraisals valued the collateral existing as of the petition date at $10,746,600.00.

various properties to BLC in at least partial satisfaction of its claim. Each time, BLC vehemently contested the debtor's authority to transfer the properties and affirmatively voiced its rejection of the same. Thus, the court is left to ponder the lingering effects of these unusual circumstances, namely, what is the impact on allowance of a default rate of interest when a creditor declines to accept a tender of property that would have partially satisfied the debt and slowed interest accrual?

While the court is cognizant of the legal reality that BLC could not be forced to accept the deeds in question absent a confirmed plan providing therefor, it is also mindful of the very real equitable considerations playing in the debtor's favor. BLC refused to accept the aforementioned tenders because it preferred to be paid in cash. However, as the debtor pointed out at the July 8, 2015 hearing, under the circumstances of this dirt-for-debt case, it was never a question of *whether* land would be conveyed back to BLC, but *how much*. Regardless of whether the purported tenders would have satisfied BLC's claim in full, they could have served as an interest-saving credit. In the name of equity, the court can find no justification for BLC to refuse to accept the transfer of properties yet still be entitled to a default rate of interest. In other words, BLC cannot have its cake and eat it too. See In re Nixon, Case No. 09-417, 2009 WL 1845229, at *12 (E.D. Penn. June 25, 2009) (affirming bankruptcy court's decision to toll interest after creditor refused to accept debtor's tender; finding that, while creditor was free to refuse offer to settle, it could not continue running up its tab).

Moreover, from the very beginning of this case, the debtor has repeatedly and explicitly stated that its intent was to pay down the principal to at least some degree *in order to prevent or at least reduce the accrual of interest*. Hence, BLC's refusal to accept the deeds "served only to permit [its] claim for interest to continue to accrue," and it would be "unjust to force [the debtor] to pay for

[BLC's] decision." Id. at *12-13. Not only that, BLC's adamant refusal to accept the tenders of property in partial satisfaction of the debt had the effect of prolonging the case. The debtor filed an accelerated petition, and filed its initial plan within five weeks of the petition date, yet, it has taken more than two years for confirmation to occur. It would be inequitable for the default rate of interest to apply post-petition under the circumstances of this case. See W.S. Sheppley & Co., 62 B.R. at 279 (pertinent factor in disallowing default rate was that year and a half long delay in confirmation hearing was due in part to creditor's tactics); see also Ace-Texas, 217 B.R. at 726 (distinguishing case from W.S. Sheppley & Co. because plan was confirmed in roughly ten months).

C.    *Time Period for Post-Petition Interest*

Last, the court will provide a basis for its reduction of post-petition interest in the amount of $724,645.18. As noted above, a secured creditor's right to interest remains subject to equitable considerations and defenses. Nixon, 2009 WL 1845229, at *13. When warranted, courts have tolled the running of interest in the name of equity. For instance, the court in Nixon, 2009 WL 1845229, at *11-13, affirmed the bankruptcy court's decision to toll the running of interest to accommodate for delays in the briefing schedule caused by illness and the creditor's refusal to settle. Similarly, here, it would be unfair for the debtor to be responsible for interest during periods of delay attributable to either the court's schedule and workload, or court proceedings initiated by BLC.[19] In many instances in this case, the court's heavy docket required that matters be taken under advisement prior to ruling, often for long periods of time. The court will allot itself a 30-day reasonableness

---

[19]Certain of BLC's actions had the effect of delay in this case, including filing motions for relief from the automatic stay, motions to continue, contesting the debtor's purported transfers of collateral, and objecting to various motions of the debtor.

period in which to rule and reduce interest for any time period thereafter.  Pursuant to this analysis, there are 266 days for which interest should be tolled:

> (1) 202 days between the initial confirmation hearing and the January 15, 2015 order, which valued select properties and determined that an indubitable equivalent analysis could not yet be undertaken (May 28, 2014 through January 15, 2015); and

> (2) 64 days the court took to rule on the debtor's designation of additional property (January 26, 2015 through May 1, 2015).

Thus, the post-petition interest award is reduced by $724,645.18, representing 266 days at a per diem of $2,724.23.

## II.  Indubitable Equivalence and Feasibility

With the amount of BLC's secured claim established at $14,685,079.49, the court has the last missing puzzle piece needed to determine whether the proposed surrender of property, plus reamortization and payment over time of the remaining debt as proposed by the debtor in its amended plan, provides to BLC the indubitable equivalent of its claim and is fair and equitable as required under § 1129(b).  The court's January 15, 2015 order set out its valuation analysis and established the total value for two tracts offered for surrender, but then stopped short.  As the court explained then,

> The total value for the Broad Creek tract and the Bay River/Smith Creek tract is $8,843,000.  Inasmuch as that value is less than the lower end of the range of the amount of BLC's secured claim, the surrender of those tracts cannot, by definition, constitute the indubitable equivalent of BLC's claim.  Therefore, the court need not go further in the analysis at this time.

Order, Doc. No. 306 at 44.  Now, with valuation established for the remaining properties[20] and the amount of the required cash component determined, the "math" is complete.  At the hearing on October 26, 2015, the court found that the amended plan was feasible, and fair and equitable, and announced the bases for those findings from the bench in open court.

As also explained in the January 15, 2015 order, "[a] bankruptcy court tasked with the responsibility of determining whether a debtor's proffered surrender of collateral provides a creditor with the indubitable equivalent of its claim must take the amount of the creditor's secured claim as its starting point, then set it against the present value of the property to be surrendered."  As is further set out in that order, indubitable equivalent valuation must, by definition, be conservative.  The order goes on to set out the methodology employed by the court in determining the value of the surrendered properties, emphasizing that conservatism in each step of the analysis.  Based upon that methodology, the court concludes that the surrender of properties valued at $13,708,000.00, plus cash paid over time to BLC in the amount of $977,079.49, will give BLC the indubitable equivalent of its claim and will constitute fair and equitable treatment.

## CONCLUSION

In sum, BLC shall be entitled to a secured claim in the amount of $14,685,079.49, comprised of the petition date principal amount of $11,048,260.05, pre-petition interest at the non-default contract rate of $1,876,157.82, post-petition interest at the non-default contract rate of $1,356,666.54, post-petition attorneys' fees of $325,000.00, and other non-legal professional fees

---

[20]The May 1, 2015 order valued the Laura Williams/Riverdale tract at $3,800,000.00, Doc. No. 380 at 3, and the Short Order recites the value of the remaining five tracts as follows: Messick, $125,000.00; Louise McCotter, $275,000.00; Silverthorne A (155.8 acres), $315,000.00; New River, $225,000.00; and Silverthorne, $125,000.00.  Doc. No. 418 at 2 n.3.

and costs in the amount of $78,995.08.  The proposed treatment of a combination of cash payments and the surrender of property is fair and equitable under § 1129(b).  Confirmation of the debtor's plan of reorganization shall be supplemented by separate order, which attaches the fully integrated plan.

**END OF DOCUMENT**