**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 16-2037**

―――――――――

In re:  BATE LAND & TIMBER LLC,

        Debtor,

------------------------------

BATE LAND COMPANY LP,

        Creditor – Appellant,

v.

BATE LAND & TIMBER LLC,

        Debtor – Appellee.

―――――――――

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington.  Terrence W. Boyle, District Judge.  (7:16-cv-00023-BO)

―――――――――

Argued:  September 12, 2017                  Decided:  December 6, 2017

―――――――――

Before NIEMEYER, DUNCAN, and FLOYD, Circuit Judges.

―――――――――

District court dismissal reversed; bankruptcy court judgment affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Niemeyer and Judge Floyd joined.

―――――――――

**ARGUED:** Matthew Nis Leerberg, SMITH MOORE LEATHERWOOD LLP, Raleigh, North Carolina; Laurie Beth Biggs, STUBBS & PERDUE, PA, Raleigh, North Carolina, for Appellant.  George Mason Oliver, THE LAW OFFICES OF OLIVER & CHEEK, P.A., New Bern, North Carolina, for Appellee.  **ON BRIEF:** Kip D. Nelson, SMITH MOORE LEATHERWOOD LLP, Raleigh, North Carolina; Trawick H. Stubbs, Jr., Joseph Z. Frost, STUBBS & PERDUE, PA, Raleigh, North Carolina, for Appellant. Amy M. Currin, THE LAW OFFICES OF OLIVER & CHEEK, P.A., New Bern, North Carolina; Mark R. Sigmon, SIGMON LAW, PLLC, Raleigh, North Carolina, for Appellee.

––––––––––––––

2

DUNCAN, Circuit Judge:

Bate Land Company LLC ("BLC") challenges the district court's dismissal of BLC's appeal of the bankruptcy court's confirmed reorganization plan (the "Confirmed Plan") for Bate Land & Timber LP (the "Debtor"). In addition to appealing the district court's conclusion that the appeal was equitably moot, BLC further urges us to hold that the bankruptcy court both failed to provide BLC with the indubitable equivalent of its secured claim and erred in reducing the amount of post-petition interest awarded. For the following reasons, we reverse the district court's dismissal of BLC's appeal and affirm the bankruptcy court.

## I.

The complexity of the proceedings below mirrors the parties' contentious relationship. Because we reach the merits of BLC's appeal, and because indubitable equivalence is an inherently fact-bound inquiry, we first consider with particular attention the bankruptcy court's detailed findings of fact.

## A.

In 2006, BLC sold the Debtor seventy-nine tracts of land in eastern North Carolina for $65 million.[1]  Of this amount, the Debtor paid $9 million in cash and financed the

---

[1] The Debtor was organized on July 31, 2006, and took on the purchase contract as a successor to the original debtor, Southeastern Timberlands Co., LLC.  For the sake of clarity, we use "the Debtor" to refer to both the original and successor organization.

3

remaining $56 million through a purchase money promissory note secured through a purchase money deed of trust encumbering the property.

In the years that followed, the Debtor paid BLC over $60 million. However, the Debtor failed to repay its debt in full by the maturation date. The parties negotiated new deadlines, but the Debtor failed to meet the revised deadlines as well. The Debtor attempted to convey two tracts of land back to BLC to satisfy its debt, but BLC rejected this proffer.

### B.

The Debtor filed for Chapter 11 bankruptcy in 2013, and BLC filed a secured claim in the Debtor's bankruptcy proceeding for approximately $13 million. The Debtor's proposed reorganization plan (the "Proposed Plan") included several other creditors, but BLC accounted for the vast majority of all debts owed.[2]

With regard to BLC, the Debtor submitted a partial dirt-for-debt provision in its Proposed Plan, by which the Debtor offered to satisfy BLC's secured claim through conveyance of the two tracts of property described above. In a dirt-for-debt plan, a creditor accepts all of its real-property collateral in satisfaction of its bankruptcy claim.

---

[2] The Proposed Plan provided for payments to be made to the Debtor's attorney (amount to be determined), various county tax collectors (approximately $30,000), Revels Turf and Tractor, LLC (approximately $30,000), Northen Blue, LLP (approximately $12,000), and a class of other unsecured claimants (approximately $90,000). BLC's claim of approximately $13 million represented by far the largest secured claim before the bankruptcy court.

In a partial dirt-for-debt plan, a debtor may transfer part of the collateral to satisfy the bankruptcy claim. *See, e.g., In re SUD Props., Inc.,* No. 11-03833-8-RDD, 2011 WL 5909648, at *2–3 (Bankr. E.D.N.C. Aug. 23, 2011) (defining partial dirt-for-debt). The Proposed Plan estimated that the combined worth of these two tracts of land was approximately $13.5 million. After this transfer of collateral, the Debtor proposed that it would retain the remaining tracts of land free and clear of any liens. The bankruptcy court circulated the Proposed Plan to its creditors on August 30, 2013. Most of the Debtor's other creditors accepted the Proposed Plan. BLC objected, however, arguing that it would not provide full compensation.[3]

A bankruptcy court has the authority to "cram down" a plan over a creditor's objections under certain circumstances. 11 U.S.C. § 1129(b)(2)(A)(iii). One such circumstance exists when the plan provides the creditor with the "indubitable equivalent" of its claim. *Id.* Bankruptcy courts purport to consider the plain meaning of this term. *See In re SUD Props., Inc.*, 2011 WL 5909648, at *5. However, application of the indubitable equivalence standard involves more flexibility than the term suggests. In the bankruptcy context, "[t]he phrase 'indubitable equivalent' . . . means in essence, that the treatment afforded the secured creditor must be adequate to both compensate the secured creditor for the value of its secured claim, and also insure the integrity of the creditor's collateral position." 4-506 *Collier on Bankruptcy* § 506.03 (16th ed. 2017).

---

[3] Revels Turf and Tractor, LLC, initially objected to the Proposed Plan, but in December 2013 it withdrew its objection. Thus, by December 2013, BLC was the only remaining objector.

In response to BLC's objections, the bankruptcy court initiated "cramdown" proceedings and conducted several hearings to ensure that the final reorganization plan would provide BLC with the "indubitable equivalent" of its claim. During these proceedings, the bankruptcy court valued the land that the Debtor proposed to transfer to BLC in satisfaction of BLC's claim.

As the bankruptcy court noted, valuing the property is the most challenging aspect of a dirt-for-debt scenario. The bankruptcy court therefore heard extensive expert testimony regarding the properties' value. The ultimate determination is significant because the higher the valuation, the less the Debtor would have to pay in cash to satisfy BLC's claim.

In valuing property, a bankruptcy court may choose to consider a property's "highest and best use" instead of its current physical condition. *See In re Thoburn Ltd. P'ship*, 513 B.R. 887, 888 (Bankr. E.D. Va. 2013). Courts have favored this approach in a dirt-for-debt setting. *See, e.g.*, *In re Sailboat* Props., LLC, No. 10-03718-8-SWH, 2011 WL 1299301, at *2 (Bankr. E.D.N.C. Mar. 31, 2011). The bankruptcy court thus decided to consider the property's highest and best use.

Here, the parties vigorously disagreed about the highest and best use of the subject parcels. BLC contended that their highest and best use was for the production and harvesting of timber. The Debtor, on the other hand, argued that at least some of the parcels had a highest and best use as residential property and were thus more valuable. The experts' respective opinions led to significantly different valuations.

6

1.

The bankruptcy court first evaluated evidence related to the two tracts of land that the Debtor initially offered BLC in satisfaction of its secured claim. The bankruptcy court determined that these two tracts featured desirable waterfront property with "navigable depths and lacking vertical hindrances" situated in a location "ideal" for watersports. Order at 32, *In re Bate Land & Timber, LLC*, No. 13-04665-8-SWH (Bankr. E.D.N.C. Jan. 15, 2015). The properties were also located in an area with a growing population and a "rebounding" residential housing market. *Id.* Accordingly, the bankruptcy court determined that the highest and best use of these two tracts was residential development. In its January 15, 2015, order, the bankruptcy court determined that the combined value of these two tracts was approximately $8.8 million.

2.

The bankruptcy court held subsequent proceedings and conducted valuations of the six additional properties that the Debtor offered in satisfaction of BLC's claim. With respect to the first of these six tracts, BLC's expert witness, Charles Moody, testified that the tract's highest and best use was for timber production. However, the bankruptcy court noted that the tract contained no mature timber and "would have to be replanted, with harvesting occurring in twenty-five to thirty years." Order at 2, *In re Bate Land & Timber, LLC*, No. 13-04665-8-SWH (Bankr. E.D.N.C. Jan. 5, 2015). Furthermore, the bankruptcy court also found that, the tract was located near "other successful residential subdivisions," had favorable topography for residential development, and was in a

7

housing market that "Moody conceded . . . was on the rise." *Id.* at 2–3. In fact, Moody's previous appraisal had found that the tract's highest and best use *was* for residential development. *Id.* at 2. Thus, the bankruptcy court found that the highest and best use for this tract would be for residential development. Based on this finding, the bankruptcy court valued the tract at $3.8 million.

The court then considered the next five tracts, all of which had been used previously for timber production. The Debtor's expert witness, Karen Cross, testified that the properties' highest and best use would be for agriculture. In contrast, Moody testified that the tracts had a highest and best use for timber management and recreation. However, Moody acknowledged that he "never even considered conversion of the tracts to agricultural purposes," which the bankruptcy court considered "a somewhat questionable omission in light of his own admission that there has been a recent resurgence in conversion from timber to agriculture" in the relevant area. *Id.* at 4. The bankruptcy court noted that these properties, too, would "not yield marketable timber for years," but they could be converted to agricultural use in about one year at a quantifiable cost. *Id.* at 5. Accordingly, the bankruptcy court determined that these properties had a highest and best use as agricultural lands and that the combined value of the five properties was just under $1.1 million.

After combining the two tracts originally proffered and the six additional tracts, the bankruptcy court determined that all eight properties that the Debtor offered in fulfillment of BLC's claim represented a total value of approximately $13.7 million.

3.

With regard to the interest owed to BLC and the resulting final amount of its claim, the bankruptcy court acknowledged that BLC was entitled to both pre- and post-petition interest, as well as attorney's fees.  However, the bankruptcy court noted that its own heavy workload, in combination with certain actions taken by BLC, had caused unreasonable delays in the proceedings.  For each day beyond thirty days that the court took to issue a ruling, it tolled the running of post-petition interest.  As a result, it subtracted 266 days from the total days for which the Debtor was accountable.  It allotted BLC over $1.356 million in post-petition interest.  Accounting for all resulting interest and fees, the court determined that BLC's secured claim had a total value of just over $14.6 million.

4.

BLC's total secured claim was $14.6 million, and the eight tracts of land offered to fulfill the claim had a value of $13.7 million.  The bankruptcy court therefore concluded that conveyance of these eight tracts of land, along with cash payments totaling approximately $1 million, served as the indubitable equivalent of BLC's claim.  The bankruptcy court issued its Confirmed Plan and an associated final order on February 3, 2016.  The Confirmed Plan set conditions for the Debtor's cash payments and noted that the $1 million in cash would be fully secured by the Debtor's remaining tracts of land.

BLC appealed five of the bankruptcy court's orders to the district court, including the bankruptcy court's final order.  All were consolidated into a single appeal.

9

II.

On appeal to the district court, BLC twice moved to stay the implementation of the Confirmed Plan lest the Debtor seek to consummate the Confirmed Plan so as to render BLC's appeal equitably moot.[4]  The district court denied both motions.

On September 6, 2016, the district court dismissed BLC's consolidated appeal as equitably moot.  The district court found that the Debtor had substantially consummated the Confirmed Plan and that the appeal would have a detrimental impact on the success of the plan, thus injuring the interests of third parties.

BLC filed a notice of appeal to this court on September 9, 2016.  BLC also filed emergency motions to the district court and this court again requesting a stay of the implementation of the Confirmed Plan pending appeal.  The district court and this court denied the motions.

On appeal, BLC first argues that the district court erred in finding that its appeal was equitably moot.  On the merits, BLC challenges the bankruptcy court's determination of the indubitable equivalence of its claim and the bankruptcy court's equitable tolling of post-petition interest.

---

[4] These motions to stay implementation were filed on February 18, 2016, and March 31, 2016.

III.

The district court dismissed BLC's appeal as equitably moot. For the reasons that follow, we disagree.[5]

Equitable mootness is a pragmatic doctrine "grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *Mac Panel Co. v. Va. Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002). It is invoked in bankruptcy proceedings because of the equitable nature of bankruptcy judgments and is applied when it becomes "impractical and imprudent 'to upset the plan of reorganization at [such a] late date.'" *Id.* (quoting *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994)). Application of the doctrine "is based on practicality and prudence," "does not employ rigid rules," and requires that a court "determine whether judicial relief on appeal can, as a pragmatic matter, be granted." *Id.* Relevant factors in this determination include:

> (1) whether the appellant sought and obtained a stay; (2) whether the reorganization plan or other equitable relief ordered has been substantially consummated; (3) the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted; and (4) the extent to which the relief requested on appeal would affect the interests of third parties.

*Id.*

---

[5] This court has declined to decide whether we review an equitable mootness determination de novo or for abuse of discretion. *See In re U.S. Airways Grp., Inc.*, 369 F.3d 806, 809 n.* (4th Cir. 2004). We need not resolve that question here either, because we would reverse the district court's dismissal of BLC's appeal under either standard.

11

We conclude that BLC's appeal is not equitably moot because the facts presented do not support the conclusion that "effective judicial relief is no longer practically available." *See Cent. States, SE & SW Areas Pension Fund v. Cent. Transp., Inc.*, 841 F.2d 92, 96 (4th Cir. 1988). BLC objects to the Confirmed Plan only to the extent that it seeks to recover additional collateral from the Debtor, and the parties have offered no reason for us to conclude that this court would be unable to order the Debtor to surrender additional cash or tracts of land to BLC. Nor is there any reason for us to conclude that it would be inequitable to do so. This is particularly true because the Debtor's surrender of additional collateral to BLC would not alter any other creditor's recovery.

We further conclude that the *Mac Panel* factors do not favor a finding of mootness. This case essentially presents a two-party dispute because BLC is the Debtor's largest secured creditor and because it appears that the secured claims of other creditors would be unaffected by the surrender of additional cash or tracts of land to BLC. Therefore, the third and fourth factors are particularly important to determining whether it would be impractical, imprudent, or inequitable to provide the requested relief. Both factors weigh heavily against mootness.

Awarding BLC its requested relief would not "affect the success of the reorganization plan or other equitable relief." *Mac Panel*, 283 F.3d at 625. BLC has, by far, the largest claim in the Confirmed Plan and, in any event, an additional recovery by BLC would not impact other creditors. The Confirmed Plan would not be disturbed in any material way by allowing BLC to seek additional compensation.

In addition, for similar reasons, consideration of the merits of the appeal would not be inequitable to any third party. The Debtor has not engaged in significant transactions with third parties who relied on the Confirmed Plan's terms such that alteration of the Confirmed Plan would negatively impact the Confirmed Plan and the third parties who relied upon it. *See In re U.S. Airways Grp., Inc.*, 369 F.3d at 810. Moreover, the fact that BLC's appeal would not alter the recovery of any other creditor or damage the interests of any party who has contracted with the Debtor means that the "relief requested on appeal" would not "affect the interests of third parties." *Mac Panel*, 283 F.3d at 625.

We conclude that the first and second *Mac Panel* factors present closer questions, but our analysis makes it clear that it still would not be inequitable to consider BLC's appeal. As to the first factor, BLC asked the district court to stay the Confirmed Plan's implementation, and the district court denied BLC's request. But because BLC merely seeks to add to its recovery from the Debtor's pocket without affecting the recovery of any other creditor, we conclude that BLC's unsuccessful attempt to obtain a stay would not render it inequitable for this court to provide the requested relief.

Under the unique circumstances here, the second factor, substantial consummation, does not outweigh the other factors favoring mootness. Even if the Confirmed Plan had been substantially consummated as defined by 11 U.S.C. § 1101, because the relief requested does not seek to *undo* any aspect of the Confirmed Plan that has been consummated, it would not be impractical, imprudent, or inequitable to allow the appeal to proceed.

Accordingly, our analysis of the equities at stake and the *Mac Panel* factors cannot support the conclusion that it would be impractical, imprudent, or inequitable to provide the requested relief.  We therefore reverse the district court's dismissal of BLC's appeal as equitably moot.

IV.

In the interest of judicial economy, we now turn to a consideration of the merits of BLC's appeal, which as it acknowledged at oral argument, are properly before us.  BLC challenges: (1) the bankruptcy court's determination of the indubitable equivalent of its claim and (2) the amount of post-petition interest awarded.  We consider each challenge in turn.

A.

BLC challenges the bankruptcy court's determination that the Debtor's conveyance of eight tracts of land and approximately $1 million in cash was the indubitable equivalent of BLC's secured claim on two alternative grounds.  First, BLC questions whether a partial dirt-for-debt plan can ever achieve the level of certitude required in an indubitable equivalence calculation.

Alternatively, BLC attacks the approval of the Confirmed Plan because it believes that the bankruptcy court incorrectly calculated the value of the land at issue.  As we have noted, the bankruptcy court found that the highest and best use for some of the tracts at issue was for residential development.  Additionally, the bankruptcy court did not apply

14

discounts for costs of sale, commissions, or loss of funds during the marketing period to the valuation of the land, which BLC argues the bankruptcy court should have applied. BLC seeks either additional cash payments or the surrender of additional property to meet the standard of indubitable equivalence as it conceives it.

1.

BLC argues that partial dirt-for-debt agreements can never provide a creditor with the indubitable equivalent of its secured claim because property valuations are inherently uncertain. We disagree. Whether or not partial dirt-for-debt plans can provide a creditor with the indubitable equivalent of its claim is a question of law which we review de novo. *See In re K & L Lakeland, Inc.*, 128 F.3d 203, 206 (4th Cir. 1997) (stating that legal conclusions are reviewed de novo).

That there are variations in appraisals for a parcel of land does not undercut a court's ability to arrive at a valuation that reflects the indubitable equivalent of a secured claim. BLC assumes that assets for which the valuation involves some uncertainty cannot be the indubitable equivalent of a secured creditor's claim. This conclusion would eviscerate the indubitable equivalence standard. There is uncertainty in all disputed valuations. *See In re Simons*, 113 B.R. 942, 947 (Bankr. W.D. Tex. 1990) ("[V]aluation is not an exact science, and the chance for error always exists."). Indeed, uncertainty permeates every determination of disputed facts.

15

However, bankruptcy courts have expertise in valuing land in the bankruptcy context. The bankruptcy court weighs the qualifications, credibility, and conclusions of each party's expert. In fact, in an effort to hedge the uncertainty inherent in property valuation, about which BLC complains, courts are instructed to take a conservative approach to determining fair market value. *In re SUD Props., Inc.*, 2011 WL 5909648, at *5 ("A conservative approach should . . . be taken in order to protect the secured creditor in this regard.") (quotation omitted). We find that, a bankruptcy court, acting as a fact-finder with specialized expertise, is well-equipped to arrive at a valuation that represents the indubitable equivalent of a secured creditor's claim, in the face of disputed valuations.

Furthermore, BLC does not provide any binding authority that compels a different conclusion. Although BLC contends that the Ninth Circuit's decision in *In re Arnold & Baker Farms*, 85 F.3d 1415 (9th Cir. 1996) supports its argument, this reliance is misplaced. *Arnold & Baker* did not hold that a partial dirt-for-debt plan could never satisfy the indubitable equivalence standard because land valuations are inherently uncertain. In fact, the Ninth Circuit explained that it "[did] not hold that the indubitable equivalent standard can never as a matter of law be satisfied when a creditor receives less than the full amount of the collateral originally bargained for [*i.e.*, in partial dirt-for-debt agreements]," *id.* at 1423, but only that the plan at issue in that case did not satisfy the standard. In that case, unfavorable market conditions and other factors made valuation particularly difficult.

16

For these reasons, we decline to hold that a partial-dirt-for-debt plan can never provide the indubitable equivalent of a secured creditor's claim, as a matter of law.

2.

With respect to the partial dirt-for-debt plan at issue, we address the standard of review before turning to the merits.

a.

We review the bankruptcy court's valuation of land in its determination of the indubitable equivalent of BLC's secured claim for clear error.  Under a different provision under Chapter 11, we have held that the question of indubitable equivalence is "a question of fact rooted in measurements of value and the credibility of witnesses."  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986).  The indubitable equivalence analysis under § 1129(b)(2)(A)(iii) involves the same factual findings as the one in *Snowshoe*.  Accordingly, we hold that the measurements of value undergirding a bankruptcy court's indubitable equivalent determination are factual findings that we review for clear error. [6]

---

[6] This holding departs from the Ninth Circuit's holding that, "[a]lthough the value of the land is a finding of fact which we review for clear error, the ultimate conclusion of indubitable equivalence is a question of law which we review de novo because it requires analysis of the meaning of the statutory language in the context of the Bankruptcy Code's 'cram down' scheme."  *In re Arnold & Baker Farms*, 85 F.3d at 1421.  However, we find that the statutory language of § 1129(b)(2)(A)(iii) is clear and that the meticulous appraisal examination required in determining indubitable equivalence is one that is (Continued)

17

The clearly erroneous standard is a demanding one.  We may not simply overturn a lower court's determination because we would reach a different conclusion.  *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74 (1985).  "A finding is 'clearly erroneous' when although there is evidence to support it the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Id.* at 573 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  We now apply that standard of review to the facts before us.

b.

BLC argues that the bankruptcy court erred by rejecting BLC's appraiser's determination of the highest and best use for some tracts of land.  BLC further argues that the bankruptcy court clearly erred by not discounting the valuation for costs associated with a sale.  In light of the bankruptcy court's detailed and thorough findings, we disagree.

The fact that the bankruptcy court weighed the evidence in a way with which BLC does not agree does not render the bankruptcy court's analysis clearly erroneous.  Furthermore, the fact that the parties' experts presented disparate appraisals of the land does not necessarily negate the indubitableness of the bankruptcy court's equivalence

---

inherently factual.  Our holding is in accord with the Seventh Circuit's view that review of this issue should be "deferential" because the question of whether a plan provides for the indubitable equivalent of a secured claim "is one of fact."  *In re James Wilson Assocs.*, 965 F.2d 160, 172 (7th Cir. 1992) (citing *In re Snowshoe,* 789 F.2d at 1088).

18

determination.  Weighing the competing evidence presented by the parties and arriving at a conclusion is exactly the task that the bankruptcy court must carry out as a fact-finder. Here, the bankruptcy court conducted a very detailed and exhaustive factual analysis considering testimony from appraisers, loggers, bankers, soil analysts, and other creditors.  It held over ten hearings and the record on appeal is nearly 4,000 pages.  In its valuation of the land, including its determination of the highest and best use of the land, the bankruptcy court weighed all of the expert testimony and made detailed findings on topics such as topography, average days on the market of property in the area, the economic climate of the location of the properties, and the economic history of the particular tracts.  *See, e.g.*,  Order at 1–6, *In re Bate Land & Timber, LLC*, No. 13-04665-8-SWH (Bankr. E.D.N.C. Jan. 5, 2015).  Further, the bankruptcy court clearly explained that it found the Debtor's expert testimony more credible than BLC's expert testimony, an assessment to which we give particular deference.  *See id.* 2–3.  The district court found it significant that BLC's witness, Charles Moody, made contradictory statements about some of the tracts of land.  For example, Moody's statement that one of the tracts had a highest and best use for timber production was directly inconsistent with his previous appraisal of the same tract in which he concluded that the highest and best use was for residential property. *Id.* at 2.

We therefore decline to find, as BLC would have us do, that the bankruptcy court's failure to blindly adopt BLC's valuation constituted clear error.  Given the fact that the bankruptcy court's analysis was thorough and not arbitrary, we are not left with the "definite and firm conviction that a mistake has been committed." *Anderson*, 470

19

U.S. at 573 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. at 395). We are thus compelled to affirm the bankruptcy court's findings.

### B.

BLC argues that the bankruptcy court erred by using its equitable discretion to disallow 266 days of post-petition interest. Again, we disagree.

The Bankruptcy Code states that an oversecured creditor "shall be allowed" to collect interest on its claim, 11 U.S.C. § 506(b), including post-petition interest. *United States v. Ron Pair Enters., Inc.* 489 U.S. 235, 237 (1989). However, an oversecured creditor's right remains subject to equitable defenses. *See, e.g.*, *In re Lapiana*, 909 F.2d 221, 224 (7th Cir. 1990) ("A statute that says 'shall' does not, by its imperative mood, extinguish all defenses."); *In re Huhn*, 145 B.R. 872, 878 (W.D. Mich. 1992) ("The creditor's right to post-petition interest is still subject to equitable defenses such as estoppel.").

The bankruptcy court disallowed 266 days of post-petition interest because it determined that it would be unfair for the Debtor to be responsible for interest that accrued during periods of delay attributable to the court's schedule or due to proceedings initiated by BLC. The bankruptcy court did not deprive BLC of its statutory entitlement by denying BLC post-petition interest *altogether*. The bankruptcy court ordered the Debtor to pay over $1.356 million in post-petition interest. This outcome is not inconsistent with the statute's mandate, which does not prevent consideration of equitable factors in calculating the post-petition interest owed. The bankruptcy court, which was

well-positioned to weigh the equities in this case, reasonably concluded that it would be inequitable to allow the Debtor to pay interest that accrued through no fault of its own. Accordingly, we affirm the bankruptcy court's reduction of the post-petition interest owed to BLC.

## V.

For the foregoing reasons we hold that BLC's appeal was not equitably moot. Reaching the merits of the appeal, we hold that the bankruptcy court did not err in calculating the indubitable equivalent of BLC's claim or in calculating the amount of post-petition interest due to BLC. Therefore, the district court's dismissal of the appeal is reversed and the judgment of the bankruptcy court is

*AFFIRMED*.